## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

### CASE NO.: _____

| | |
|---|---|
| CHARLES RAY FINCH,<br><br>    Plaintiff,<br><br>      vs.<br><br>WILSON COUNTY; SHERIFF CALVIN L. WOODARD, JR., in his official capacity; TONY McCOY OWENS, in his individual capacity; JAMES TANT, in his individual capacity; Special Agent ALAN H. McMAHAN, in his individual capacity; and JOHN H. WATTERS, in his individual capacity.<br><br>    Defendants. | **COMPLAINT**<br>(Jury Trial Demanded) |

Plaintiff CHARLES RAY FINCH, by and through his undersigned counsel, complains of

Defendants Wilson County, Sheriff Calvin Woodard, Jr., Tony McCoy Owens, James Tant, Alan H.

McMahan, and John H. Watters, as follows:

### INTRODUCTION

1. In 1976, Charles Ray Finch ("Ray Finch") was convicted and sentenced to death for a

murder he did not commit. Although his death sentence was vacated in 1977 after the United States

Supreme Court invalidated the North Carolina death penalty statute in 1976, he thereafter spent

*forty-three years* in prison before being exonerated in 2019.

2. Mr. Finch's conviction, death sentence, and imprisonment were not the result of

mistake, negligence, or incompetence. They were the direct result of the intentional and/or reckless

misconduct of members of the Wilson County Sheriff's Department ("WCSD"), including but not

limited to Sheriff Wilbur Robin Pridgen ("Pridgen"), Chief Deputy Tony Owens ("Owens") and Deputy James Tant ("Tant").

3.     At the time of the robbery and murder in 1976 that led to Ray Finch's wrongful imprisonment, Chief Deputy Owens, acting in concert with the Sheriff Pridgen, and other members of the WCSD, including Deputy Tant, had been engaged in rampant corruption for at least two years, and probably as long as five years.

4.     An investigation by the FBI begun in 1977 established that members of the WCSD, including Sheriff Pridgen and Chief Deputy Owens, had for years actively solicited and accepted bribes to protect prostitution rings, illegal gambling enterprises, and the transportation and distribution of narcotics in Wilson County.

5.     In addition, the FBI investigation disclosed that members of the WCSD, with the knowledge and acquiescence of Sheriff Pridgen and Chief Deputy Owens, had facilitated a robbery ring operating in Wilson County, whereby one or more employees of the WCSD would set up robberies and burglaries of local businesses and individuals by local criminals and divide the proceeds of the thefts with the perpetrators. Specifically, the FBI found that a Sheriff's deputy would identify a business, such as a country store, that was known to be holding large amounts of cash, and facilitate a robbery or burglary of that store.

6.     Upon information and belief, in the event that a person who had knowledge of or involvement in the illegal conduct engaged in by members of the WCSD was suspected of or arrested for some criminal conduct, Pridgen and Owens would take steps to ensure that the charges were dismissed, or that the person otherwise received favorable treatment by the State. This was

2

done to ensure that the person did not reveal his knowledge of or involvement with the illegal conduct of the WCSD.

7.     The FBI investigation established that Chief Deputy Owens, with the knowledge and acquiescence of Sheriff Pridgen, had set up individuals for false arrests, and paid a known criminal to plant drugs on a third party. One witness described Chief Deputy Owens to the FBI as the most lawless individual in the Wilson County Sheriff's Department.

8.     Upon information and belief, prior to the time of the Richard Holloman murder in February 1976, for which Mr. Finch was wrongfully arrested and convicted, there had been a number of similar robberies in the county involving country stores, and three other instances in which the owner of a country store had been killed during the robbery.

9.     Upon information and belief, the robbery of Holloman's store—the crime that resulted in the murder of Mr. Holloman—was organized by members of the WCSD with the assistance and/or knowledge of Chief Deputy Owens and Sheriff Pridgen.

10.     Upon further information and belief, Ray Finch was framed for the murder by Chief Deputy Owens and Deputy Tant to protect Sheriff Pridgen, Chief Deputy Owens, the WCSD, and others from criminal liability for their illegal conduct.

11.     In 1979, North Carolina SBI Agent Alan McMahan was assigned to investigate whether Ray Finch had been framed by Sheriff Pridgen and Chief Deputy Owens to protect the individual who had committed the murder, but who had knowledge of Pridgen and Owens soliciting bribes to protect a prostitution ring operating in Wilson County. However, McMahan instead covered up the motive of Pridgen and Owens to frame Finch, and thereby violated Finch's constitutional right of meaningful and effective access to the courts.

3

12.     But for McMahan's misconduct, Ray Finch's conviction would have been vacated decades earlier than it was.

13.     Beginning in 2003, and continuing through at least 2011, SBI General Counsel John Watters concealed exculpatory information relevant to Mr. Finch's case from attorneys with the Duke Innocence Project (the "Innocence Project"), misled the Innocence Project about whether the SBI possessed materials and evidence related to Mr. Finch's case, and thereby deprived Mr. Finch of his constitutional right of meaningful and effective access to the courts.

14.     But for Watters's misconduct, Ray Finch's conviction would have been vacated decades earlier than it was.

15.     Mr. Finch brings this suit to seek redress for the violation of his constitutional rights by Owens, Tant, McMahan, and Watters, and to recover damages for his forty-three years of wrongful imprisonment.

## JURISDICTION AND VENUE

16.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights secured by the U.S. Constitution.

17.     This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331.

18.     Venue is proper under 28 U.S.C. § 1391(b). On information and belief, all Defendants reside in this judicial district. Further, a substantial part of the events or omissions giving rise to the claim occurred in this district.

4

## PARTIES

19.    Charles Ray Finch is a citizen and resident of Wilson County, North Carolina.

20.    Defendant Wilson County is a governmental subdivision of the State of North Carolina, and is a municipal entity authorized by the North Carolina Constitution and organized under the laws of the State of North Carolina.  At all times relevant to this Complaint, the Wilson County Board of Commissioners controlled the office of the Sheriff through the County's funding of the Sheriff's office and its power to oversee the acts and practices of the County Sheriff, and to file a petition to remove the Sheriff for willful misconduct or maladministration in office.

21.    Defendant Sheriff Calvin Woodard, Jr. ("Sheriff Woodard") is a citizen and resident of Wilson County, and is named in his official capacity as the chief law enforcement officer in Wilson County, and as the final policymaker for Wilson County for all purposes relevant to this Complaint. Under North Carolina law, the Sheriff is a county official and is the chief law enforcement official of the county, and the county's final policymaker for law enforcement purposes. Sheriff Woodard is successor to Sheriff Robin Pridgen.

22.    Defendant Tony McCoy Owens ("Defendant Owens") is, upon information and belief, a citizen and resident of Wilson County, North Carolina. At all times relevant to this Complaint, Owens was employed as the Chief Deputy for the Wilson County Sheriff's Department, and was acting under color of state law within the scope of his employment.

23.    Defendant James Tant ("Defendant Tant") is, upon information and belief, a citizen and resident of Wilson County, North Carolina. At all times relevant to this Complaint, Tant was employed as a Deputy for the Wilson County Sheriff's Department, and was acting under color of state law within the scope of his employment.

5

24.     Defendant Special Agent Alan McMahan ("Defendant McMahan") is, upon information and belief, a citizen and resident of North Carolina. At all times relevant to this Complaint, McMahan was a special agent for the North Carolina State Bureau of Investigation, and was acting under color of state law within the scope of his employment.

25.     Defendant John H. Watters ("Defendant Watters") is, upon information and belief, a citizen and resident of Wake County, North Carolina. At all times relevant to this Complaint, Watters served as counsel to the North Carolina State Bureau of Investigation, and was acting under color of state law within the scope of his employment.

## JURY TRIAL DEMAND

26.     Charles Ray Finch hereby demands a trial by jury on all issues and claims set forth in this Complaint.

## FACTS

### During the 1970s, the Wilson County Sheriff's Department was Operated as a Corrupt Enterprise by Sheriff Pridgen and Chief Deputy Tony Owens

27.     In November 1974, Robin Pridgen, who had been the Chief Deputy of the Wilson County Sheriff's Department for a number of years, was elected Sheriff of Wilson County. He took office in January 1975. He served as the Sheriff until he was removed from office following his conviction on federal racketeering charges in 1979.

28.     Defendant Tony Owens was employed by the Wilson County Sheriff's Department in the capacity of Deputy Sheriff from July 1970 until January 1975. Beginning in January 1975, Owens was promoted by Sheriff Pridgen to Chief Deputy of the Wilson County Sheriff's

Department. He was the second in command of the Sheriff's Department, and served in that capacity until approximately March 22, 1979.

29.     Upon information and belief, beginning no later than September 1, 1973, and continuing until at least 1978, members of the Wilson County Sheriff's Department, including Defendant Owens, operated the Wilson County Sheriff's Department as a Racketeer Influenced and Corrupt Organization ("RICO") enterprise.

30.     This RICO enterprise included prolific and wide-ranging corruption involving prostitution, gambling, narcotics, stolen merchandise, and an organized robbery ring in which the members of the Sheriff's Department were active participants, and for which members of the Sheriff's Department set up, coordinated, and profited from robberies and burglaries of local individuals and businesses.

31.     Upon information and belief, the corruption within the Wilson County Sheriff's Office was or reasonably should have been known to members of the Wilson County Board of Commissioners, who tolerated and condoned the corrupt practices that existed within the Sheriff's office.

32.     The arrest of Ray Finch for the alleged robbery and murder of Richard Holloman occurred during the height of this period of corruption, and was the result of this pattern of corruption.

A.     **The FBI Investigation**

33.     In 1977, Sheriff Pridgen and Chief Deputy Owens were identified as the targets of a sweeping federal investigation that confirmed an extensive and prolonged pattern of corruption by

7

the Sheriff's Department, and which directly called into question the validity of Mr. Finch's arrest, trial, and conviction.

34.     More specifically, in 1977 the FBI opened a formal investigation based on confidential allegations that Sheriff Pridgen, Defendant Owens, and other employees of the Wilson County Sheriff's Department had, over a number of years, solicited and accepted payments and "carnal bribes" in exchange for protection of prostitution and gambling enterprises in Wilson County.

35.     The FBI's investigation into these matters also disclosed additional corrupt and dishonest acts on behalf of Pridgen, Defendant Owens, and other employees of the Wilson County Sheriff's Department, that went well beyond soliciting and accepting payoffs and bribes from local prostitution and gambling outfits.

36.     For example, the FBI investigation disclosed that Pridgen and Defendant Owens, along with other members of the Wilson County Sheriff's Department, protected drug dealers; were involved with the theft, transportation, and sale of illegal cigarettes; trafficked in stolen goods; dealt in narcotics and marijuana; solicited money for the return of stolen property; and facilitated a robbery scheme.

37.     The FBI reports also contain numerous allegations of significant misconduct specifically attributable to Defendant Owens, including setting up individuals in Wilson County for false arrests, and paying a known criminal to plant drugs on a third party.

B.     **The Sheriff's Department's Robbery Ring**

38.     The FBI's investigation also determined that the Wilson County Sheriff's Department facilitated a robbery scheme in the county, whereby one or more Wilson County Sheriff's Deputies

8

would set up robberies or burglaries of local businesses and/or individuals and divide the proceeds with the actual perpetrators. Among the targets were the dozens of small country stores in Wilson County.

39.     In December 1975, Richard Holloman was arrested and charged with receiving stolen property.

40.     In February 1976, Richard Holloman owned and operated a small country store and gas station on Highway 117 in Wilson County.

41.     Upon information and belief, Holloman ran a gambling operation in the back room of the store and dealt in stolen goods, and was known to have a safe with cash in the back of the store.

42.     Upon information and belief, in the years prior to the time of the Holloman murder on February 13, 1976, there had been a number of similar robberies in the county involving country stores, and three other instances in which the owner of a country store had been killed during a robbery.

43.     The robbery ring involved a number of well-known criminals in Wilson County with close ties to the Wilson County Sheriff's office. Besides the robberies and burglaries, the ring was involved in trafficking stolen merchandise through known local "fences," such as Bobby Duke, the owner of a local truck stop and a personal friend of Defendant Owens.

44.     FBI reports detailed specific instances in which a Sheriff's deputy would identify a business, such as a country store, or an individual who was known to be holding large amounts of cash, and facilitate a robbery. In at least one case, a Sheriff's deputy provided police walkie-talkies that were used by the criminals in the theft.

9

## The Murder of Richard Holloman

45. At approximately 9:00 p.m. on February 13, 1976, Richard Holloman was shot and killed inside his store.

46. Mr. Holloman died as the result of at least two, and possibly three, gunshot wounds. One entrance wound was on his thorax, near his right collarbone. An additional entrance wound was on his back, high on his right shoulder, and appeared to have been fired from a point above Holloman, who also had scrapes on his knees. These wounds were consistent with Holloman having been shot while kneeling on the floor.

47. Lester Floyd Jones, a white man, was the only eyewitness to the crime. Jones was an employee of Mr. Holloman's store at the time of the murder, and was a social friend of Defendant Owens, with whom he played pool.

48. The first law enforcement officer to respond to the scene was a North Carolina State Highway Trooper, Larry Richardson.

49. Trooper Richardson talked to Jones about he had witnessed. He then gave Jones a pen and paper and told him to "write down exactly what happened."

50. In its entirety, the description Jones wrote is as follows:

> We had closed and 3 Black Males came up Walking and asked if They could get an alkaselsa and we Unlocked and Went in and The 1 Male With a Stocking over his head said This is a Robery and drew a sawed off Shoot Gun and Blasted at Mr. Hollowman one Had a Black cap on The other Had a Tobogen on They were walking [*sic*]

51. At the time he wrote out his witness statement for Trooper Richardson, Lester Jones had not identified Finch, who was a frequent customer at Holloman's store, as either the male with

the "Black cap" or the male with a "Tobogen." Nor had he identified Finch as the alleged triggerman, who was the "Male With a Stocking over his head."

52.     Upon information and belief, the robbery of Holloman's store had been set up by the Wilson County Sheriff's office, acting in conjunction with local criminals, pursuant to the scheme uncovered by the FBI investigation. As a result, Defendant Owens was waiting in his car near the store at the time of the robbery, and knew who had murdered Mr. Holloman as soon as he heard what had happened.

53.     Defendant Owens arrived on the scene at 9:20 p.m, only 20 minutes after the shooting. By Owens's own testimony, he was waiting in his car only a mile from the store when the murder occurred.

54.     Defendant Owens knew Ray Finch, a lifelong resident of Wilson County. Finch had testified at a murder trial relating to the shooting death of Mr. Finch's brother by two white males, and had implicated Owens's uncle as an uncharged accomplice. Owens had told Finch that he would "get him," and had unsuccessfully attempted to frame him for a robbery in 1975.

55.     When he arrived at the scene, Defendant Owens did not speak to Trooper Richardson or obtain Jones's written statement from him. Owens briefly interviewed Jones and then, despite Jones *not identifying Finch* (who frequented Holloman's store as a customer, and had a charge account there) as one of the perpetrators, Owens had an APB broadcast to stop and arrest Mr. Finch. At that time, Owens had no evidence that tied Mr. Finch to the robbery-murder of Holloman.

11

## The Arrest of Ray Finch

56.     Shortly thereafter, Mr. Finch was stopped by the Wilson Police, arrested, and brought to the Wilson County Jail.  He would not be released from custody until May 23, 2019, more than 43 years later.

57.     At the time of his arrest,  Ray Finch adamantly denied having anything to do with the attempted robbery and murder of Richard Holloman. He told Defendant Owens that Charles Lewis had admitted to Finch that he (Charles Lewis) had committed the crime and hidden the shotgun he used to shoot Holloman behind a building on East Nash Street in Wilson.

58.     At the time of his arrest, Ray Finch did not have in his possession a stocking, a black cap, or a toboggan, as described by Lester Jones in his written statement.  He was wearing a three-quarter-length black coat, which had *not* been mentioned by Jones in his written statement to Trooper Richardson.

59.     Defendant Owens then proceeded to fabricate evidence of Finch's guilt. Upon information and belief, this was done to protect the actual perpetrators, including Charles Lewis, who knew of the Wilson County Sheriff's Department's (and Owens's) involvement in illegal activity.

## Defendants Fabricated Inculpatory Evidence Against Ray Finch

### A.     The Identification of Finch as a Perpetrator

60.     At approximately 12:30 a.m. on February 14, 1976—just a few hours after the murder—Defendant Owens arranged for witness Lester Jones to view a series of three in-person lineups, all of which included Ray Finch.

61.     Following Jones's initial written statement to Trooper Richardson, and prior to the in-person lineups, Jones's description of the perpetrators was augmented to include the detail that the shooter was wearing a three-quarter-length black coat.

62.     Upon information and belief, the additional detail regarding the coat was suggested to Jones by Defendant Owens after Ray Finch was arrested wearing a three-quarter-length black coat. After he was arrested, Finch was brought past the room at the Wilson County jail in which Jones was waiting to view the lineup, wearing his three-quarter-length black coat.

63.     Upon information and belief, Jones was able to see that Finch had recently been arrested before viewing any lineup.

64.     Defendant Owens was in charge of the lineups and had the ability and authority to determine the composition of the lineups, the attire that the individuals in the lineups wore, and how the lineups were conducted. He conducted three lineups within the space of 30 to 45 minutes.

65.     Each lineup consisted of the same seven men. They were simply shuffled in the lineup for each of the three viewings by Jones. Furthermore, the lineups were conducted one right after the other, without significant time in between.

66.     In each of the lineups, Ray Finch was the only person wearing a three-quarter-length black coat. Indeed, Mr. Finch was the *only* person wearing a coat of any kind in each of the three lineups.

67.     Mr. Finch was therefore the only person in each of the three lineups who appeared to have recently come to the Sheriff's office from outside, making a misidentification even more likely.

68.     By organizing the lineups in the way he did, and conducting three lineups one right after the other, Defendant Owens intentionally "marked" Ray Finch as the perpetrator, ensured that

13

Jones identified Finch as the triggerman, and further ensured that this identification become cemented in the Jones's mind.

69.     Defendant Owens's "marking" of Ray Finch as the perpetrator resulted in the identification of Mr. Finch by Jones in each of the three lineups.

70.     The fact that Jones identified Mr. Finch in the second and third lineups, contrary to establishing that his identification was reliable, demonstrated only that Jones could pick out the same person, who was wearing the same clothes, out of a group of the same seven people, three times in a row.

71.     Defendant Owens knew that this lineup procedure was unfair, and that such an identification procedure made the likelihood of a misidentification much more likely, if not inevitable.

72.     Despite the unfair and suggestive lineups, Jones subsequently expressed uncertainty regarding his identification of Mr. Finch. When speaking with an acquaintance several days later, he asked the acquaintance what Mr. Finch looked like, and said he was "not sure" of his identification of Mr. Finch.

   **B.     The Shotgun Shell**

73.     In his statement to Trooper Richardson, Jones claimed that Holloman had been killed by a shotgun blast. When he was stopped and arrested on the evening of February 13, 1976, Ray Finch was not in possession of a shotgun, or any other firearm.

74.     On February 14, 1976, at 12:30 a.m., Ray Finch signed a form consenting to the search of his person, premises, and automobile.

14

75.     After receiving the consent form, Defendant Tant searched Mr. Finch's car and claimed to have found a shotgun shell in an ashtray in the back seat of the car. He inventoried that shotgun shell into evidence.

76.     Upon information and belief, the alleged discovery of the shotgun shell by Defendant Tant was a fabrication.

77.     The shotgun shell allegedly found in the ashtray in the backseat of Finch's car was subsequently admitted into evidence at Ray Finch's trial.

78.     In his summation, the prosecutor used this shotgun shell to argue that it linked Ray Finch to the murder of Holloman.

## Defendants Concealed Exculpatory Evidence From the Prosecutor

### A.     The Identification of Charles Lewis

79.     One of the issues at Ray Finch's trial was whether Lester Jones had identified anyone besides Finch as being involved in the robbery-murder of Mr. Holloman.

80.     On February 13, 1976, on the night of Mr. Holloman's murder, Charles Lewis was also arrested by the Wilson Police Department in connection with Mr. Holloman's murder. However, the charges against him were later dismissed.

81.     Charles Lewis was living and working at the Forest Inn Motel in 1975 and 1976. This was the location of one of the prostitution rings that the Wilson County Sheriff's Department had been protecting in return for bribes. According to the FBI investigation, Sheriff Pridgen and Defendant Owens collected bribes from the owner of the motel, and Defendant Owens himself used the services of prostitutes (for free) at the Forest Inn Motel, where he would have been seen by Lewis. In short, Lewis had direct knowledge of Owens's illegal activity at the motel.

15

82. Upon information and belief, on at least one occasion, a member (or members) of the Sheriff's Department had approached Charles Lewis and invited him to participate in a heist with other known criminals. Lewis was told he would be allowed to keep the money from the heist if it was successful. During this time period, Charles Lewis was known to be engaging in criminal activity in Wilson County, including, for example, the theft of large quantities of truck tires and related equipment. Upon information and belief, these materials were sold to or trafficked through Bobby Duke, the owner of the Southern 500 Truckstop and Defendant Owens's close friend.

83. Upon information and belief, prior to Finch's trial, Defendant Owens told the prosecutor that Jones had not identified Lewis as one of the perpetrators in the Holloman robbery-murder.

84. In fact, according to an August 10, 1979, SBI report, Jones *had* identified Lewis as one of the perpetrators from a photo lineup on February 17, 1976, four days after the murder.

85. This identification of Lewis by Jones was concealed by Defendant Owens from the District Attorney's office. Consequently, this information was never disclosed to Mr. Finch.

86. Upon information and belief, Defendant Owens concealed evidence implicating Charles Lewis in Mr. Holloman's murder because Lewis possessed incriminating evidence related to Defendant Owens's corrupt practices involving the county's prostitution enterprises and the theft ring.

87. Although Charles Lewis was initially charged with Mr. Holloman's murder, the charges against Lewis were later dismissed without explanation by the Wilson County District Attorney.

## B. The Ballistics Report

88.     Prior to Ray Finch's trial, Defendant Tant told the District Attorney that he had discovered a shotgun shell in an ashtray in the back seat of Finch's car. He repeated this claim during the trial.

89.     In an attempt to link that shell to the murder of Richard Holloman, the prosecutor asked Defendant Tant to take a knife and cut open the shell allegedly found in Finch's car, and had Tant hand the contents of the shell to the jury so the jurors could compare the pellets inside that shell to a pellet recovered from Holloman's body.

90.     Defendant Tant did so, and the pellets from the shotgun shell, along with the pellet taken from Holloman's body, were then passed among the jury for them to compare.

91.     In fact, prior to Finch's trial, the SBI had examined the pellet taken from Holloman's body to determine whether it was of the same gauge and make as the shotgun shell Tant claimed to have found in Mr. Finch's car.

92.     The SBI ballistics report, which was provided to Defendant Owens, was exculpatory, in that it reflected that the SBI was unable to determine the gauge and make of the pellet recovered from Holloman's body, and that it was therefore not possible to determine whether the pellet matched the shotgun shell purportedly found by Defendant Tant. In essence, the pellets were "generic," and could not be "matched" to any particular No.1 Buck shotgun shell.

93.     The SBI ballistics report, despite being exculpatory, was concealed by Defendant Owens, and was not provided to the prosecutor, Mr. Finch, or his attorney. This permitted the District Attorney to argue in closing that it wasn't a coincidence that the pellets in the shotgun shell allegedly found in Finch's car were "the same" as the pellet recovered from Holloman's body.

17

### C. The Tony Horton Robberies and Arrest

94.     At trial, Finch's lawyer tried to establish that there were alternative suspects who had never been investigated by the Wilson County Sheriff's Department.

95.     Otis Walston testified that on the night of Mr. Holloman's murder, he had given a ride to several black males, one of whom was Tony Horton, and that the men were in possession of a sawed-off shotgun and a second firearm.

96.     Walston further testified that he had told Captain J. T. Smith of the Wilson Police Department and Defendant Owens about Tony Horton having a shotgun and another gun in his car on the night of the Holloman murder.

97.     On or about June 10, 1976, weeks *prior* to Finch's trial, Tony Horton was arrested in Greensboro, North Carolina, in connection with an armed robbery there. At that time, he was also charged with the armed robberies of three separate country stores/gas stations *in Wilson County, two of which had occurred on February 18, 1976, just five days after the Holloman robbery and murder.* The third Horton robbery of a country store/gas station in Wilson County occurred in March 1976.

98.     In June 1976, prior to the commencement of Finch's trial, warrants were issued for Tony Horton in connection with the Wilson County robberies.

99.     Defendant Owens never informed the District Attorney prosecuting Finch about the Tony Horton robberies or arrest warrants. As a result, Finch's defense attorney was deprived of this information, which tended to corroborate Otis Walston's testimony and would have allowed Finch's lawyer to argue that Horton was the triggerman.

18

100.    Horton was later convicted and received a seven- to ten-year sentence for the Wilson County armed robberies. Despite Walston's testimony, Defendant Owens never charged Horton with the attempted robbery and murder of Richard Holloman.

### Between 1974 and 1978, the Wilson County Sheriff's Department Engaged in a Pattern and Practice of Violating Due Process and Engaging in Illegal Conduct

101.    In 1977, the FBI began a formal investigation into the allegations that Sheriff Pridgen, Chief Deputy Owens, and other employees of the Wilson County Sheriff's Department had, *over a period of years*, accepted payments and "carnal bribes" in exchange for protection of these illegal enterprises from criminal investigation and prosecution.

102.    Sheriff Pridgen, Defendant Owens, and other members of the Wilson County Sheriff's Department concealed their illegal activity from the Wilson County District Attorney. It was not until May 1977, almost a year after Ray Finch's conviction, that District Attorney Frank Brown, who had prosecuted Mr. Finch, wrote to Director Haywood Starling of the SBI and asked him to "initiate a discrete and quiet preliminary investigation" regarding allegations of "misconduct" in Wilson County Sheriff's Department.

103.    According to FBI reports, beginning no later than 1974, the Wilson County Sheriff's Department fostered a culture of lawlessness and corruption that was insidious, wide-ranging, and perverse. The following allegations are based upon the FBI investigation of Wilson County law enforcement misconduct.

104.    The acts of lawlessness and corruption took several forms, with Sheriff Pridgen, Chief Deputy Owens, and other deputies ignoring the rule of law that resulted in the Sheriff's Department

19

working hand in hand with, and at times exploiting, local criminals and criminal enterprises for their mutual enrichment.

105. Under Sheriff Pridgen and Chief Deputy Owens, due process was sacrificed in favor of rampant and opportunistic misconduct by Pridgen, Owens, and other employees of the Sheriff's Department, all in flagrant and purposeful disregard of the rights of the citizens of Wilson County.

106. The Wilson County Sheriff's Department was run with an "anything goes" mentality, without any apparent concern for repercussions for the Sheriff, the deputies, or the citizens of Wilson County.

107. For example, the Wilson County Sheriff's Department observed no policies or procedures regarding the safeguarding of evidence. Contraband and other materials seized as evidence, such as weapons and narcotics, were repeatedly converted to the personal use of employees of the Sheriff's Department.

108. On one occasion, Defendant Owens confiscated a cache of stolen shotguns from Bobby Earl Poythress and Jerry Wayne Griffin. Neither Poythress nor Griffin was arrested and charged with possession of the stolen guns. Upon information and belief, the stolen weapons were never turned in to the Wilson County Sheriff's Department as evidence. Instead, Defendant Owens converted the weapons to his own use or sold the weapons for his personal enrichment.

109. In the 1970s, at least three houses of prostitution operated in Wilson County. They were located at the Forest Inn Motel, the Rainbow Motor Court, and the Bel Air Truck Stop.

110. In addition to the prostitution enterprises, there were several illegal gambling businesses in Wilson County, including one located in a building known as the Clubhouse behind the Beefmaster Restaurant on Highway 301 South, just outside the city limits of Wilson.

20

111. The houses of prostitution and the gambling enterprises were known to, and protected by, the Wilson County Sheriff's Department.

112. Members of the Sheriff's Department would also warn suspects of investigations by other law enforcement agencies, and tell them "they should go to Morehead City until things cooled off."

113. At all other times, Sheriff Pridgen, Defendant Owens, and other deputies exploited the prostitution and gambling houses for their own personal gain.

114. With respect to the county's prostitution industry, there was abundant evidence that Sheriff Pridgen and his deputies were frequently seen at the Forest Inn Motel, the Rainbow Motor Court, and the Bel Air Truck Stop, where Sheriff Pridgen would regularly accept envelopes of money, and deputies would get free "dates" from the girls employed by the house of prostitution. Defendant Owens was, according to FBI reports, a habitual visitor of the county's prostitution enterprises, including the Forest Inn Motel. Defendant Owens was also provided prostitutes to accompany him on trips to the beach, according to the FBI reports.

115. Other evidence obtained by the FBI in its investigation into the Wilson County Sheriff's Department painted a lurid portrait of rampant injustice, where the Sheriff's Department frequently accepted money and things of value in connection with criminal wrongdoing by others— not just prostitution and gambling—and used the power, influence, and resources of the Sheriff's Department to enrich themselves and subvert due process.

116. As but one example of many, an individual named Bobby Duke ran the Southern 500 Truckstop in Wilson, and was known to traffic in narcotics and stolen goods. Defendant Owens

admitted to the FBI that he and Bobby Duke were friends, but told the FBI that he was unaware of illegal activity on the part of Bobby Duke.

117.    FBI reports, however, contain a detailed account of a witness who was present when Bobby Duke paid Defendant Owens $3,000.00 to arrest a truck driver who was a competitor to Duke's drug trafficking operation. The same witness provided information that Duke paid Defendant Owens on a separate occasion to arrest a medical doctor in a neighboring town on a pretextual charge.

118.     William "Billy" Howell, who was an active participant in the robbery ring facilitated by the Sheriff's Department, told the FBI that he once paid Defendant Owens and another deputy more than $2,000.00 to protect him from charges that he stole steaks from a business known as the Steak Barn while on parole.

119.    Another criminal defendant, Richard Gerald Adams, informed the FBI that he was arrested by Defendant Owens, and that Defendant Owens told him "he would forget everything for $50,000."

120.    An individual known as Big Boy Powell, who dealt in illegal cigarettes, also paid Defendant Owens for protection from investigation and prosecution in connection with the sale of such cigarettes.

121.    According to information provided by former Deputy Sheriff James Hawley to the FBI, Sheriff Pridgen and Defendant Owens received payoffs at the Sheriff's Department on multiple occasions from Lee Narron, who had a local gambling operation.

122.    Defendant Owens was also well-versed in obstruction of justice. For example, after the FBI had interviewed Billy Howell regarding corruption in the Wilson County Sheriff's

22

Department, Defendant Owens contacted Robert Pittman, a participant in the theft ring, to let him know to expect to be interviewed by the FBI.

123.     This type of behavior was a pattern for Defendant Owens, who would later engage in similar behavior following Mr. Finch's conviction to obstruct and hinder Mr. Finch and his attorneys from discovering facts tending to establish Mr. Finch's innocence, as described in detail below.

124.     Defendant Owens's illegal conduct was endorsed, condoned, and facilitated by Sheriff Pridgen and other members of the Wilson County Sheriff's Department.

125.     After operating the Sheriff's Department as a RICO enterprise for several years, Sheriff Pridgen was indicted and convicted in federal court on RICO charges.

126.     As Chief Deputy, Defendant Owens was second in line to Sheriff Pridgen. He was responsible for supervising other members of the Sheriff's Department. Upon information and belief, Defendant Owens had, in reality, a greater level of day-to-day control over the Wilson County Sheriff's Department than did Sheriff Pridgen.

127.     Ray Finch's arrest, trial, and conviction, all of which transpired in the midst of unprecedented corruption and unchecked lawlessness on the part of the Wilson County Sheriff's Department, arose out of, and were the product of, this pattern and practice of violating due process and engaging in illegal conduct.

128.     Owens's criminal conduct was powerful impeachment evidence that could have been used to completely undermine his credibility at Ray Finch's trial, had Owens not concealed this criminal conduct from the District Attorney.

23

**Prior to July 1976, the Wilson County Board of Commissioners Condoned and Ratified the Unlawful Conduct of the Wilson County Sheriff's Department**

129.    Wilson County is a small, tight-knit rural county in eastern North Carolina, where information was quickly shared among the residents in the 1970s.

130.    Upon information and belief, during the early 1970s, up through July 1976, members of the Wilson County Board of County Commissioners either knew, or reasonably should have known, of the unlawful conduct of the Sheriff's office towards the citizens of the county.

131.    The Wilson County Board of Commissioners set the budget for the Wilson County Sheriff's Department and provided the vast majority of the funding for that office.  It therefore had substantial power to control the conduct of the Sheriff's Department.  It also had the power to seek an investigation of the Sheriff's Department by the SBI or the FBI, or to petition to remove the Sheriff from office.

132.    Upon information and belief, the Wilson County Board of Commissioners took no steps to attempt to stop the unlawful conduct of the Sheriff's Department towards Wilson County citizens.  It thereby condoned and ratified the unlawful conduct of the Sheriff's Department.

**The Cover-Up**

133.    From the date of his arrest, and for the ensuing forty-three years, Mr. Finch has been unwavering in maintaining his innocence.

134.    Mr. Finch, and persons acting on his behalf, such as the Duke Innocence Project, have made numerous pleas to state and local officials to review the circumstances of his arrest in light of the foregoing facts, but these efforts were thwarted at every turn by persons seeking to conceal facts

24

and evidence related to Mr. Finch's case, and to obstruct and hinder Mr. Finch in his efforts to establish his innocence in court, as was his constitutional right.

> **A.** **SBI Agent McMahan's Willful Blindness**

135. In February 1979, Sheriff Pridgen was convicted of RICO charges in federal court for arranging for the payment of bribes in return for protecting houses of prostitution from criminal investigation, among other things. One of those houses of prostitution operated at the Forest Inn Motel, where Charles Lewis had lived and worked.

136. On May 17, 1979, Mr. Finch filed a pro se Motion for Appropriate Relief ("MAR") alleging his innocence and seeking to have his conviction vacated.

137. On May 29, 1979, shortly after filing his MAR, Mr. Finch wrote a letter to then-Sheriff L. G. Taylor in which he alleged that his conviction was the result of "unjustice acts" by Sheriff Pridgen and Defendant Owens. Mr. Finch asserted that Pridgen and Defendant Owens knew who actually committed Mr. Holloman's murder, but "instead framed [Finch], because the murderer could have implicated them in corruption in Wilson County."

138. On June 18, 1979, after consulting with the Assistant District Attorney assigned to the MAR, Sheriff Taylor requested SBI assistance regarding the allegations in Finch's letter.

139. On June 29, 1979, the Superior Court of Wilson County appointed a lawyer to represent Mr. Finch on his MAR.

140. On July 1, 1979, Defendant Alan McMahan of the SBI was assigned to investigate Mr. Finch's allegations about Pridgen and Defendant Owens, based on the fact that he was "familiar with Wilson County."

25

141. Defendant McMahan's "investigation" consisted of reviewing portions of the Sheriff's Department's investigative files and court records, and interviewing Mr. Finch and Charles Lewis.

142. During his interview with Ray Finch on August 7, 1979, Finch told Defendant McMahan that at the time of the Holloman murder, Charles Lewis and his family had been living at the Forest Inn Motel, where Lewis also worked for the owner, Mrs. O'Brien. Lewis had told Finch that Sheriff Pridgen and Chief Deputy Owens came out to the motel "all the time, picking up money."

143. Lewis had also told Finch that he had gambled with members of the Sheriff's Department, who would not only let him commit crimes, but had asked him to commit a burglary at Food World in Wilson—to help them set up the arrest of some other local criminals—and offered to let him keep the money he took from the safe there.

144. Finch told Defendant McMahan that he (Finch) had told Defendant Owens at the time he was arrested that Lewis had not only admitted to Finch that he (Lewis) had killed Holloman, but that Lewis also told Finch that he had hidden the shotgun behind a building on the 500 block of Nash Street. Between February 13, 1976 and June 26, 1976, the Wilson Police Department found a shotgun belonging to Charles Lewis behind a club on East Nash Street.

145. Finch also supplied Defendant McMahan with the names of other witnesses who had allegedly heard Charles Lewis admit to committing the murder while he was incarcerated at Central Prison in the spring of 1979, and the name of a witness who had allegedly seen Defendant Owens give trial witness Nobel Harris cash in the hallway of the courthouse during Finch's trial.

26

146.    When Defendant McMahan interviewed Charles Lewis on August 8, 1979, Lewis admitted he had lived at the Forest Inn Motel, where he cut grass and cleaned the rooms, for about a year. He claimed, however, that he had "never seen Deputy Sheriff Tony Owens or Sheriff Robin Pridgen at the motel," and did not "ever remember seeing a marked Deputy Sheriff's car at the motel." This was inconsistent with what the FBI had already determined, and with the evidence presented at Pridgen's federal trial.

147.    During July and August of 1979, Defendant McMahan either knew or reasonably should have known that there was substantial evidence of corruption in the Wilson County Sheriff's Department, and that Sheriff Pridgen himself had been convicted in federal court of running the Sheriff's Department as a racketeer influenced and corrupt organization (a RICO enterprise).

148.    Defendant McMahan's report indicates that he never contacted the FBI to obtain the evidence they had gathered, which would have corroborated what Finch had told McMahan about the corrupt conduct of Sheriff Pridgen and Defendant Owens, and about Defendant Owens's motive to protect Charles Lewis from prosecution for the Holloman murder.  McMahan also never contacted any of the witnesses to Lewis's admissions told by Finch to McMahan to see if they corroborated Finch's information.

149.    Had Defendant McMahan simply contacted the lead FBI agent, Special Agent Lin Jordan, who was assigned to the Raleigh FBI office, he would have discovered, as Jordan testified at an MAR hearing in 2013, that Defendant Owens himself had been involved "in protection of prostitution, illegal gamblind and/or drugs," that he had specifically protected prostitutes working at the Forest Inn Motel in Wilson, and that he had offered to protect other individuals from criminal charges in return for bribes. He would also have discovered that the corruption in the Wilson County

Sheriff's Department was, according to Special Agent Jordan, "probably the most pervasive law enforcement corruption" he had seen, and that Owens had been described by one FBI witness as the most corrupt person in the Wilson County Sheriff's Department.

150.    Instead, after interviewing Mr. Finch and Charles Lewis on consecutive days in August 1979, Defendant McMahan concluded on August 10, 1979 that he had been "*unable to substantiate the allegations [Finch] made* in his letter to Sheriff L. G. Taylor concerning corruption on the part of the Wilson County Sheriff's Department, *especially on the part of former Sheriff Robin Pridgen, and Chief Deputy Tony Owens.*" (Emphasis added.)

151.    In light of the multi-year investigation and prosecution of Pridgen and Defendant Owens by the FBI,  the evidence gathered by the FBI during that investigation, the indictments of Pridgen and Defendant Owens, and the February 1979 conviction of Pridgen on corruption-related charges, all of which were well-publicized in eastern North Carolina, Defendant McMahan's conclusion demonstrated a reckless disregard for the truth and for the rights of Mr. Finch.

152.    On January 21, 1980, an evidentiary hearing was held in Wilson County Superior Court on Mr. Finch's MAR. Because Defendant McMahan failed to adequately investigate and corroborate the allegations in Mr. Finch's May 29, 1979, letter, neither Mr. Finch nor his appointed lawyer could present evidence supporting those allegations in court. As a result, Mr. Finch was deprived of his constitutional rights to the effective assistance of counsel and to meaningful and effective access to the courts during his January 1980 MAR hearing.

153.    The failure by Defendant McMahan in 1979 to adequately investigate Mr. Finch's allegations in light of the clear and well-known evidence of pervasive corruption by the Wilson County Sheriff's Department, including evidence directly implicating Sheriff Pridgen and Defendant

28

Owens, who was intimately involved in Mr. Finch's arrest, trial and conviction, resulted in Mr. Finch's MAR being denied, and his remaining imprisoned for 40 additional years.

**B.** **The Concealment of Files by John Watters in 2003**

154. The Duke Innocence Project (the "Innocence Project") began representing Mr. Finch in 2001.

155. The Innocence Project began its investigation by trying to track down and obtain copies of files related to Mr. Finch that should have been maintained by the Wilson County Sheriff's Department, the Wilson County District Attorney's office, and the SBI—files that might contain evidence that could be used to demonstrate Mr. Finch's innocence.

156. The Innocence Project sought the files related to Mr. Finch's case beginning in 2001, but the files and evidence related to Mr. Finch's case were deliberately concealed and withheld from the Innocence Project for years.

157. The Innocence Project eventually discovered that most materials and evidence related to Mr. Finch's case that should have been maintained by Wilson County Sheriff's Department, the Wilson County District Attorney's office, and the SBI were either missing or had been destroyed.

158. For example, the Innocence Project learned in 2002 that the entire file of the Wilson County Sheriff's Department pertaining to Mr. Finch's case, including investigative notes, crime-scene photographs, and other forensic evidence, was "missing." Upon information and belief, Defendant Owens was responsible for the case file being destroyed.

159. James Coleman, an attorney with the Innocence Project and professor of law at Duke Law School, spoke with then-Wilson County Sheriff Wayne Gay sometime in 2002. Sheriff Gay told Professor Coleman that the prior Sheriff, Lewis Taylor, had asked the SBI to investigate Mr. Finch's

claim that officials in the Sheriff's Department had framed him for Mr. Holloman's murder, and that the SBI had prepared a file on its investigation into Mr. Finch's case.

160.    Believing that the SBI file on Mr. Finch might contain evidence relevant to establishing Mr. Finch's innocence, and further, that the SBI file might contain all or portions of the missing Sheriff's Department file, the Innocence Project immediately began to seek the SBI's file on Mr. Finch.

161.    Following his communication with Sheriff Gay, Professor Coleman communicated with Defendant Watters, who at that time was counsel for the SBI, inquiring about the SBI investigation of the Finch case and the case file.

162.    The Case Identification Screen Data form relating to the 1979 investigation conducted by SBI Agent McMahan shows the name "Watters, John" under the heading "Case Dissemination."

163.    An SBI "evidence and administrative services note sheet" states that "a copy of the entire SBI file was made and given to Attorney Watters on February the 13th, '03."

164.    During his conversation with Professor Coleman, Defendant Watters confirmed that the SBI had in fact conducted an investigation into Mr. Finch's case at the request of the Wilson County Sheriff's Department.  Defendant Watters agreed to consider the Innocence Project's request for a copy of any SBI reports produced as a result of that investigation.

165.    On or about September 18, 2003, Professor Coleman wrote a detailed letter to Howard S. Boney Jr., the Wilson County District Attorney at the time. The letter carefully described the results of the Innocence Project's investigation up to that point. Professor Coleman's letter requested an opportunity to meet with Mr. Boney to discuss the Innocence Project's findings.

166. The letter was hand-delivered to Assistant District Attorney Earnest R. Joseph Jr., who met briefly with the representatives of the Innocence Project at that time, including Mr. Coleman.

167. During this meeting with the Innocence Project, ADA Joseph displayed an inch-thick file that he claimed was related to Mr. Finch. However, ADA Joseph refused to turn over a copy of the file to the Innocence Project, saying that it belonged to the SBI.

168. On or about September 19, 2003, Professor Coleman sent Defendant Watters a copy of the detailed letter hand-delivered the previous day to ADA Joseph, and included a copy of an affidavit by the Medical Examiner confirming that Mr. Holloman had been killed by separate gunshot wounds, and not by a shotgun blast as claimed by alleged eyewitness Lester Jones. The cover letter to Defendant Watters requested a meeting with the SBI to discuss reopening its investigation into Mr. Finch's conviction in light of new evidence uncovered by the Innocence Project.

169. On or about December 11, 2003, Defendant Watters informed Professor Coleman that the SBI would not release any materials or evidence in its possession related to Mr. Finch. Defendant Watters told Professor Coleman that the SBI would not help him establish that a law enforcement officer had engaged in misconduct.

170. At this time, the SBI did in fact have in its possession materials and evidence that were exculpatory, including the file pertaining to the SBI's 1979 investigation into Mr. Finch's case.

171. The evidence in the possession of the SBI included, among other things, the SBI ballistics report, which report was inconsistent with the District Attorney's closing argument at Finch's trial regarding the significance of the pellets in the shell allegedly found in Finch's car.

31

172. The evidence in the possession of the SBI also included the report of Lester Jones's identification of Charles Lewis on February 17, 1976, as one of perpetrators in the murder of Richard Holloman. This evidence impeached Defendant Owens's testimony at Finch's trial, corroborated what Finch told Defendant McMahan on August 7, 1979, and was inconsistent with what Lewis told Defendant McMahan on August 8, 1979.

173. Upon information and belief, Defendant Watters knew or should have known that information in the SBI file related to Mr. Finch constituted exculpatory and impeachment evidence, and that concealing this evidence would deprive Mr. Finch of his right to meaningful and effective access to the courts and result in Mr. Finch's further wrongful confinement.

174. During the time that the Innocence Project was seeking these materials and evidence from the SBI, Mr. Finch continued to languish in prison for a crime he did not commit.

175. Defendant Watters's concealment in 2003 of exculpatory and impeachment evidence related to Mr. Finch deprived Mr. Finch of his constitutional right of meaningful and effective access to the courts, and resulted in Mr. Finch remaining incarcerated for an additional 16 years.

### C. Defendant Owens's 2003 False Statements and Obstruction of Justice

176. On March 17, 2003, representatives of the Innocence Project interviewed Defendant Owens regarding Mr. Finch's case, and specifically asked Defendant Owens about the in-person lineups he conducted in which Mr. Finch had been identified by Lester Jones.

177. Defendant Owens falsely claimed to the Innocence Project that Assistant District Attorney David Williams had supervised the lineups.

32

178. Defendant Owens also falsely claimed that ADA Williams had caused the persons in the lineups to change outfits for each lineup, and had made sure that the long black coat (which was added to Jones's initial description of the triggerman) was worn by others in the lineups.

179. Defendant Owens's statements regarding Mr. Williams's participation in the Finch lineups were false, and were fabricated with the intention of obstructing justice related to Mr. Finch's conviction.

180. On October 1, 2003, the Innocence Project interviewed Lester Jones in West Jefferson, North Carolina. Jones, who had been a social friend of Owens in 1976, disclosed that he had been spoken to Defendant Owens *the day prior to the interview*.

181. Upon information and belief, Defendant Owens's September 30, 2003, conversation with Jones, the State's one eyewitness, was calculated to influence and contaminate Jones's memory of the events surrounding the murder of Mr. Holloman and the in-person lineups staged by Owens, and did in fact influence and contaminate Jones's memory.

182. In the alternative, Defendant Owens convinced Jones to falsify what he told the Innocence Project in order to protect Owens.

183. In Jones's October 1, 2003 interview, Jones's version of the events surrounding Mr. Holloman's murder, including the in-person lineups where he identified Mr. Finch, closely corresponded to what Defendant Owens had falsely claimed to the Duke Innocence Project on March 17, 2003, including that the persons in the lineup changed clothes and hats for each lineup, and that Mr. Finch was not wearing the three-quarter-length black coat in the lineups. These details, while consistent with Owens' story, were false.

184.     Defendant Owens's efforts to improperly influence Jones's version of the Finch lineups and other matters associated with Mr. Finch's arrest and trial constituted obstruction of justice.

**D.     The Concealment of Files by Defendant Watters in 2008**

185.     In August 2008, private counsel, who had undertaken *pro bono* representation of Mr. Finch, again contacted Defendant Watters to seek help in obtaining evidence from the case.

186.     Defendant Watters responded, claiming that he had:

> requested a search of the files of the SBI be conducted for *any evidence* collected during the initial investigation, presented at the trial of Mr. Finch *or* evidence related to this case uncovered during the subsequent investigation by the SBI. The search failed to uncover any such items of evidence, including photographs, related to Mr. Finch's case. (Emphasis in original.)

187.     Contrary to Defendant Watters's assertion, the SBI did have exculpatory and impeachment evidence in its possession related to Mr. Finch's case, including the SBI ballistics report and the Lester Jones identification of Lewis, and such evidence was in Watters's possession as early as February 2003, when the Innocence Project first sought to obtain records from the SBI.

188.     Upon information and belief, Defendant Watters knew or should have known that evidence in the SBI file related to Mr. Finch constituted exculpatory and impeachment evidence, and that concealing this evidence would deprive Mr. Finch of his right to meaningful and effective access to the court and would result in Mr. Finch's further wrongful confinement.

189.     Defendant Watters's continued concealment of this exculpatory and impeachment evidence related to Mr. Finch's case in 2008 resulted in Mr. Finch being incarcerated for an additional 11 years.

### E. Defendant Watters's Concealment of Files in 2011

190. On or about February 9, 2011, the Innocence Project again wrote to the SBI seeking access to the agency's files relating to the Finch case. This time, the request was made pursuant to N.C. Gen. Stat. § 15A-1415(f), which had been amended by the North Carolina General Assembly, effective December 1, 2009, to provide criminal defendants investigating claims for post-conviction relief access to "the complete files of all law enforcement and prosecutorial agencies involved in the investigation of the crimes committed or the prosecution of the defendant."

191. On September 13, 2011, seven months after the Innocence Project's February 9, 2011, request, and more than eight years after the Innocence Project's first request to Defendant Watters, Defendant Watters finally allowed Professor Coleman access to a microfilm copy of its Finch investigative file, including a copy of the Agent McMahan's report dated August 10, 1979.

192. This information disclosed for the first time that McMahan's "investigation" had lasted no more than 40 days and was perfunctory at best.

193. The materials to which Professor Coleman was permitted access did *not* contain the Wilson County Sheriff's Department files that Agent McMahan had reviewed in 1979.

194. The materials likewise did *not* contain the SBI ballistics report showing that it was not possible to determine the gauge and make of the pellet allegedly removed from Holloman's body, and that it was not possible to determine whether the pellet was of the same gauge and make as the shell purportedly found by Defendant Tant in Mr. Finch's car.

195. The ballistics report, which was in the possession of Defendant Watters as early as February 2003, was not turned over by the SBI until *August 19, 2013*—more than two and a half years following the Innocence Project's statutory request to the SBI.

35

**F.** **The District Attorney Produces a Portion of His Finch File in 2011**

196.    On February 17, 2011, the Innocence Project made a request to the Wilson County District Attorney Robert A. Evans, pursuant to N.C. Gen. Stat. § 15A-1415(f), seeking "the complete files of all law enforcement and prosecutorial agencies involved in the investigation of the crimes committed or the prosecution of the defendant."

197.    On September 29, 2011, the Innocence Project sent a letter to District Attorney Evans, informing him that the SBI had produced its file on the Finch case, but that the "Sheriff Department files are no longer in the SBI's possession."

198.    The letter also renewed the Innocence Project's February 17, 2011, request for access to the District Attorney's files, adding that "[b]ased on the files that we obtained from the SBI, your office should have some key documents relating to the case."

199.    District Attorney Evans finally responded to the Innocence Project's letter and provided several photographs of trial exhibits, including photographs of the three lineups in which Mr. Finch appeared on February 14, 1976.

200.    In May 2012, the Innocence Project sent a second, comprehensive letter to District Attorney Evans, summarizing the new evidence it had uncovered during its 10-year investigation, including important evidence that was contained in the SBI's previously undisclosed August 10, 1979, report—including that Lester Jones had identified Charles Lewis in a photo lineup within days of the Holloman murder. The letter requested an opportunity to meet with District Attorney Evans to discuss Mr. Finch's claim of innocence.

201.    Mr. Evans agreed to a meeting, and on July 9, 2012, Innocence Project representatives met with him and one of his assistants. At that meeting, the Innocence Project asked Mr. Evans to

review the new evidence, interview the assistant district attorneys who had knowledge of the SBI's 1979 investigation, determine if the missing portion of the SBI file could be found, and assist the Innocence Project in obtaining judicial relief for Mr. Finch.

202.     In October 2012, Mr. Evans wrote to the Innocence Project that "the issues raised in your materials would be cause for serious concern in any criminal trial. Looking at them in their totality, one could reasonably argue that it is *possible* Mr. Finch did not commit this crime." (Emphasis in original.)

203.     Nevertheless, although he "readily concede[d] the troubling aspects of this case," Mr. Evans wrote that he was not persuaded that the materials provided by the Innocence Project "amount to objectively verifiable proof of actual innocence," and for that reason, he declined to "seek relief jointly" with the Innocence Project.

### G.     Defendant Owens's 2013 False Statements and Obstruction of Justice

204.     After an evidentiary hearing was scheduled in 2013 on Mr. Finch's MAR, Defendant Owens's contacted former ADA Williams prior to the hearing for the purpose of improperly influencing Mr. Williams's recollection of events and testimony at the MAR hearing.

205.     Upon information and belief, Defendant Owens told District Attorney Evans prior to Mr. Finch's 2013 MAR hearing that former ADA Williams had recently told him "how adamant and how quickly and how sincere that the witness [Jones] was in the picking out Ray Finch." Defendant Owens also falsely claimed to Evans that Mr. Williams recalled being present at the Finch lineups.

206.     When called as a witness at the MAR hearing, however, Mr. Williams testified that he did not supervise the Finch lineups, nor did he have any recollection of the case whatsoever. Mr.

37

Williams testified, "I told him [Owens] that I did not recall coming here or this case or assisting him with that at all."

207.    Upon information and belief, these false statements by Defendant Owens to District Attorney Evans contributed to his decision not to consent to the relief requested prior to the February 2013 hearing.

208.    This resulted in Mr. Finch spending an additional six years in prison for a crime he did not commit.

## Charles Ray Finch Suffered Grievous Damages

209.    As a result of the misconduct of all defendants, Charles Ray Finch lost 43 years of his life. He is now 82 years old and in poor health. In effect, he served a life sentence for a crime he did not commit.

210.    Of those persons wrongly convicted and imprisoned in the United States who were later exonerated, only two men—Richard Phillips (45 years) and Wilbert Jones (44 years)—served longer sentences than Charles Ray Finch.

211.    Imprisoned for nearly half a century, Mr. Finch experienced more than four decades' worth of indignities in North Carolina's prison system.

212.    Mr. Finch suffered a variety of physical injuries while in prison, as documented in his Department of Corrections file. He was assaulted by other inmates on several occasions, and had to fight to protect himself.

213.    During his period of confinement, he lost his father, two sisters, a brother, and an aunt. He was deprived of the opportunity to be with them and support them during their illnesses,

and could not comfort his own family upon their deaths. He was permitted to attend only his father's funeral, and then only in shackles.

214. Mr. Finch had several young children when he was taken into custody. He was deprived of the joy and privilege of seeing them grow up. This lost time and these experiences he will never get back and can never replace. He missed their journeys through elementary school, high school, and into the adult world. He was prevented from being there to support them emotionally, financially, and as a father who cared for his children. Due to his prolonged absence, he became estranged from his children, who struggled to live their lives in his absence.

215. For 43 years, he was not allowed to see and experience the outside world. He was confined in small rooms with concrete walls, concrete floors, and virtually no amenities people in the outside world enjoyed. Day in and day out, he ate prison food and wore prison clothes.

216. For 43 years, he was deprived of meaningful companionship, and meaningful emotional support.

217. For 43 years, every minute of Mr. Finch's day, each day, was dictated by someone else. He was told when to get up, when to eat, when to exercise, when to shower, and when to go to sleep. He was told when he could have visitors, and when he could not.

218. Mr. Finch received inadequate and incomplete medical care while in prison despite his increasing age. After leaving prison, he was diagnosed with cancer, a diagnosis that may have been made much earlier if Mr. Finch had not been languishing in prison.

219. In the months prior to his exoneration and release from prison, Mr. Finch suffered a debilitating stroke. The stroke has impaired his ability to think and to speak.

220. All the while that Mr. Finch was in prison, he faced the utter hopelessness of knowing he would likely one day die in prison; of knowing that he was innocent, but that persons who might have information tending to establish his innocence might forever conceal it.

221. Mr. Finch fought for years to establish his innocence, and was routinely ignored or thwarted in his efforts by those persons who guarded and concealed the information that would, in 2019, be found by a federal court to preclude any reasonable juror from finding Mr. Finch guilty beyond a reasonable doubt.

## FEDERAL CONSTITUTIONAL CLAIMS

## COUNT I

### 42 U.S.C. § 1983

### MALICIOUS PROSECUTION AND SEIZURE
### IN VIOLATION OF THE 4TH AND 14TH AMENDMENTS

### (February 1976)

(Against Defendant Owens in his individual capacity)

222. Plaintiff incorporates paragraphs 1 through 221 above and further alleges as follows.

223. On February 13, 1976, North Carolina Highway Patrol Trooper Larry Richardson was the first law enforcement officer to arrive at the scene of the Holloman murder, just a few minutes after the 911 call.

224. The sole eyewitness, Lester Jones, could provide Trooper Richardson with only a sketchy description of the perpetrators:

> Three black males
> One with a stocking over his head
> One had a black cap on
> One had a Toboggan on
> They were walking
> One had a checked shirt

40

225. Defendant Owens arrived at the scene at approximately 9:20 P.M. He interviewed Jones, with whom he was friends, but Jones did not recognize any of the black males who had attempted to rob the store, and could provide only generic descriptions – race, age, height, weight complexion, and clothing.

226. Despite this, within minutes of arriving at the scene, Defendant Owens requested that Ray Finch be arrested and brought to the Wilson County jail to be placed in a lineup.

227. At the time Defendant Owens made this request, there was no evidence linking Finch to the attempted robbery and murder of Richard Holloman.

228. The Wilson Police Department, acting on Defendant Owens's request, stopped Mr. Finch's car a short time thereafter, arrested him, and brought him in handcuffs to the Wilson County jail sometime before midnight. No warrant had been issued by any court.

229. Defendant Owens advised Mr. Finch of his Miranda rights before he interrogated him. Finch denied any involvement.

230. At the time Ray Finch was arrested, there was no probable cause to believe he had been involved in the attempted robbery and murder of Richard Holloman.

231. The arrest of Ray Finch without probable cause violated Mr. Finch's Fourth Amendment and Fourteenth Amendment rights.

232. Defendant Owens's conduct in causing the arrest of Ray Finch was malicious, and evidenced a reckless and callous disregard for, and deliberate indifference to, Plaintiff's constitutional rights.

233. Defendant Owens's unconstitutional conduct was committed in the course and scope of his employment with the Wilson County Sheriff's Department and under color of state law.

41

234. The criminal proceeding initiated by the unconstitutional arrest of Ray Finch was finally terminated in his favor in June 2019, when all charges then pending against him were finally dismissed by the District Attorney.

235. As a direct and foreseeable consequence of Defendant Owens's misconduct, Ray Finch was unreasonably and unlawfully subjected to criminal prosecution and 43 years of incarceration.

236. As a direct and foreseeable consequence of being arrested, prosecuted, and imprisoned for 43 years, Ray Finch suffered personal physical injury, physical sickness, emotional trauma, loss of consortium, and loss of liberty in each year from 1976 to 2019, as well as other damages to be determined at the trial of this matter.

## COUNT II

### 42 U.S.C. § 1983

### DENIAL OF FAIR TRIAL IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDEMENT

### (June 1976)

(Against Defendants Owens and Tant in their individual capacities)

237. Plaintiff incorporates paragraphs 1 through 236 above, and further alleges that Defendants Owens and Tant deprived Plaintiff of his constitutional right to a fair trial in June 1976 as follows.

## *The Fabrication of False Inculpatory Evidence*

238.    Defendants Owens and Tant deprived Ray Finch of his liberty without due process of law by fabricating inculpatory evidence that was used in June 1976 to convict and imprison him for 43 years.

## The Identification of Finch

239.    Defendant Owens fabricated inculpatory evidence against Ray Finch through the use of a lineup procedure that he knew was unfair, and that was designed to intentionally cause Lester Jones to falsely identify Ray Finch as the person who murdered Richard Holloman.

240.    Defendant Owens, knowing that Jones had initially described the person who killed Holloman as having "a stocking over his head," and that Jones had subsequently claimed that person was wearing a "three-quarter-length black coat," created three lineups with the same seven males.

241.    Defendant Owens than arranged for the arresting officers to bring Finch, wearing his three-quarter-length black coat, past the room at the Wilson County jail in which Jones was waiting to view the lineup. From this room, Jones would have had a clear view to see that Finch had recently been arrested wearing a black three-quarter-length black coat.

43

242.    Defendant Owens knowlingly constructed the first lineup to ensure that Jones picked Finch as the person who had killed Holloman.   Finch was the only person in the lineup who was wearing a black three-quarter-length coat.  None of the other men in the lineup had any outerwear on at all.   Accordingly, Jones identified Finch as the triggerman.



243.    To solidify Jones's identification of Finch, Defendant Owens immediately conducted a second lineup. The same black males were included, wearing the same clothes, although Defendant Owens had them line up in a different order. Once again, Finch was the only person in the lineup wearing a black three-quarter-length coat. No one else was wearing any outerwear at all.  Once again, Jones identified Finch.



244.    Defendant Owens then conducted yet another lineup with the same black males. There was no valid investigative reason to conduct three essentially identical lineups, one right after the other.

245.    Upon information and belief, Defendant Owens did this to bolster Jones's initial identification of Finch, and to ensure Jones identified Finch as the gunman at the trial. Finch was again the only person wearing a three-quarter-length black coat. Jones again identified Finch.



246.    At an MAR hearing in November 2013, Defendant Owens falsely claimed under

oath that he did not have Finch wear a three-quarter-length black coat in the lineups:

> We took the pea coat that Ray Finch was wearing and a toboggan off
> of him and put it on another inmate. . . .  And we set the lineup
> according to that. We brought in the witness, Lester Jones, and Lester
> immediately identified Ray Finch. . . .  Even though he was not
> wearing the pea coat nor the cap or the toboggan.
>
> *      *      *      *
>
> We had him removed, Mr. Jones, changed everybody around,
> changed clothing again. . . . Took the jacket from the one that had it
> on, had some change clothes entirely with each other and had Mr.
> Jones brought back in and he once again identified Ray.
>
> Q.    And was Ray wearing the jacket at that point?
>
> A.    No.
>
> Q.    Neither time?
>
> A.    Neither time.
>
> *      *      *      *
>
> Q.    And why didn't you have Mr. Finch wearing the coat that the
>        witness said he was wearing?
>
> A.    Well, once again, if a man recognizes you he recognizes you
>        by your facial features not what you got on. Ray Finch didn't
>        have that coat on. The man identified him without the coat on.
>         . . . *If the coat had been on him that would not have, in my
>        opinion, been a fair lineup for Ray Finch* so, therefore, I had
>        the coat removed.

247.    Once confronted with the photographic evidence, Owens had to admit that the lineups

he had conducted had been unfair:

> Q.    . . . State's Exhibit Number 1 [from the Finch trial], do you
>        see that down there?
>
> A.    Yes. . . .

47

Q.     And Ray Finch is right in the middle there, right?

A.     Correct.

Q.     What's he wearing?

A.     He's wearing a black, appears to be leather coat.

Q.     Three-quarter length?

A.     Yes.

Q.     And is anybody else wearing the coat in that photo?

A.     No.

                    *       *       *       *

Q.     So my question is, sir, if you knew it wasn't fair to have Finch there in a lineup with his coat on, why did you put him in the lineup with his coat on?

A.     Well, I have no idea.

Q.     Well, let's take a look at State's Exhibit Number 2.

A.     He's still got it on there. . . .

Q.     Everybody else is still wearing the same clothes; right? You didn't switch any clothes around in that lineup. You just switched where people were in the lineup; right?

A.     Okay, yeah. . . .

Q.     And Mr. Finch is still wearing that jacket; right?

A.     Yes, he is.

Q.     And if it was unfair the first time, it was even more unfair the second time; wasn't it?

A.     Well, not more unfair, no.

Q.     Just unfair?

A.     Just unfair.

Q.     And now let's go to State's Exhibit Number 3. . . . He's still wearing the three-quarter-length coat; right?

48

A.    Right.

Q.    And not a single other person in any of these photo lineups, in any of these lineups  .  .  . was wearing a black or dark three-quarter length coat; right?

A.    That's right.

Q.    And it was still unfair the third time; right?

A.    Yeah.

248.    The false identification of Finch Jones was introduced at Finch's trial in June 1976. Jones identification was the only direct evidence of Finch's guilt.

249.    The fabricated identification of Finch caused by Owens violated the due process clause of the Fourteenth Amendment and deprived Ray Finch of a fair trial.

### The Shotgun Shell

250.    When Ray Finch was stopped just minutes after the Holloman murder, he was not in possession of any stockings, masks, or weapons.  There was no physical evidence on his person or in his car that linked him to the crime, nor was there any physical evidence at the scene that linked Finch to the murder.

251.    After his arrest, Finch signed a consent to search his car. Pursuant to this consent, and acting at the direction of Chief Deputy Owens, Deputy Tant conducted a search of Finch's car in the early morning hours of February 14, 1976.

252.    Coming back from the search, Defendant Tant claimed to have found a 12-gauge shotgun shell in the ashtray in the back seat in the car.

253.    Upon information and belief, that claim was a fabrication. There was no shotgun shell in the ashtray in the back seat in Finch's car on February 14, 1976.

49

254. Upon information and belief, the shotgun shell allegedly "found" by Defendant Tant had been planted in Ray Finch's car, at the direction of Defendant Owens.

255. Upon information and belief, Defendant Owens had a custom and practice of planting inculpatory evidence on innocent people.

256. This shotgun shell became a critical piece of evidence at Finch's trial in June 1976. It was the only physical evidence allegedly linking Finch to the murder of Mr. Holloman.

257. During the trial, at the request of the District Attorney, Defendant Tant cut open the shell so the jurors could compare the pellets inside that shell with a pellet recovered from Holloman's body during the autopsy. In his closing argument, the District Attorney argued that the similarity of the pellets in the shell with the pellet from Holloman's body provided physical evidence linking Finch to the murder.

258. The introduction at trial of the fabricated evidence that the shotgun shell had been found in an ashtray in the backseat of Ray Finch's car deprived Finch of a fair trial and due process of law.

259. Based upon the false and misleading evidence that Defendants Owens and Tant created, Ray Finch was convicted of first-degree murder arising out of the shooting death of Richard Holloman.

260. Defendants' fabrications directly and proximately caused Ray Finch's wrongful conviction and deprivation of liberty without due process of law for 43 years, as well as the other injuries and damages set forth in this Complaint.

### *The Concealment of Exculpatory Evidence*

261.    Defendant Owens intentionally concealed material exculpatory and impeachment evidence from the District Attorney at Ray Finch's trial in June 1976, and thereby deprived Finch of his right to a fair trial.  The exculpatory and impeachment evidence intentionally concealed by Owens in June 1976 included the following:

### Owens's Criminal Conduct

262.    As the Chief Deputy in the Wilson County Sheriff's Department from January 1974 through the time of Ray Finch's trial in June 1976, Owens had day-to-day responsibility over the conduct of the deputy sheriffs and their supervisors, and had substantial knowledge of their daily activities.  He also had substantial knowledge of the illegal activity that was taking place in Wilson County in the period before Ray Finch's trial in June 1976.

263.    As detailed in paragraphs 101 through 128 above, Defendant Owens himself was involved in corrupt conduct.   Owens's corrupt conduct included, but was not limited to the following:

    a.   Protecting prostitution, illegal gambling, drug distribution and the  sale of illegal cigarettes in return for money or sexual favors;

    b.   Soliciting prostitutes for himself;

    c.   Protecting criminal suspects from arrests in return for money or sexual favors;

    d.   Soliciting bribes;

    e.   Setting up individuals for false arrests and planting evidence;

    f.   Stealing drugs from dealers including marijuana and pills, and selling the drugs on the street;

g. Trafficking in stolen goods;

h. Stealing guns and cigarettes from the Sheriff's evidence room; and

i. Ignoring the criminal conduct of Sheriff Pridgen and other deputies, including Deputies Tant, Gay and Gene Lewis.

264. Defendant Owens concealed his corrupt conduct from the District Attorney's office.

265. Evidence of Defendant Owens's corrupt conduct was material to the credibility of the investigation he conducted into the murder of Richard Holloman, and to his credibility as a witness at Ray Finch's trial.

266. The corrupt conduct of Defendant Owens, and particularly the fact that Owens had set up individuals for false arrests, and had planted evidence on innocent individuals, would have been powerful impeachment evidence of Owens at Finch's trial.

267. The rampant corruption within the Sheriff's Department, including setting up robberies throughout the county, would have substantially undermined the credibility of Defendants Owens and Tant at Finch's trial.

268. The intentional concealment of this information from the District Attorney in June 1976 prevented it from being disclosed to Finch's defense counsel. This deprived Finch of this critical impeachment evidence and his due process right to a fair trial.

<u>The SBI Ballistics Report</u>

269. In February 1976, Defendant Owens sent the pellet recovered from Holloman's body, along with the 12-gauge No.1 Buck shotgun shell allegedly recovered from the ashtray in Finch's backseat, to the SBI crime laboratory for analysis, in an attempt to match the No. 1 Buck shotgun pellet recovered from Holloman's body to the shotgun shell allegedly recovered from Finch's car.

52

270.    On February 23, 1976, SBI firearms examiner F.G. Satterfield sent his report back to Defendant Owens. In that report, he informed Owens that the gauge and make of the pellet recovered from Holloman's body could not be determined.  As a result, the SBI was not able to match it to the shotgun shell allegedly recovered from Finch's car.  In short, there was no way to determine if that particular pellet came from that particular type of shell.

271.    Defendant Owens concealed the SBI firearms report from the District Attorney prior to and during Finch's trial.

272.    During the trial, as noted earlier, the District Attorney had the jury compare the pellets from the shell allegedly found in Finch's car with the pellet recovered from Holloman's body.

273.    Based on this visual "comparison" by the jury, the District Attorney argued in closing:

> Don't you think it is a coincidence that in that Cadillac automobile there was this shotgun shell, and when you had the opportunity to examine it, you could see that the buckshot were just like or very similar to the one that was removed from the body of Mr. Holloman.

274.    If Defendant Owens had not concealed the SBI report from the District Attorney prior to and during the trial, Finch's attorney could have called Agent Satterfield to testify that the pellet recovered from Holloman's body was a generic pellet that would be "similar" to any No. 1 Buck shot, that the gauge and make of the shell it came from could not be determined, and that it could not be identified as coming from the type of shotgun shell allegedly recovered from the ashtray in the backseat of Finch's car.

275.    This testimony, corroborated by the SBI Lab report, would have impeached the argument that the pellet recovered from Holloman's body could be linked to the shotgun shell allegedly found in Mr. Finch's car.

53

276.    Defendant Owens concealed the firearms report from the District Attorney prior to and during Finch's trial, so it was not provided to Finch's defense counsel. Owens's conduct deprived Finch of this critical exculpatory evidence and his due process right to a fair trial.

### Jones's Identification of Charles Lewis

277.    One of the other males placed in the lineups conducted by Owens just after midnight on February 13, 1976, was Charles Lewis. Jones did not identify Lewis as being involved in the Holloman murder at that time.

278.    However, Jones subsequently identified Lewis as one of the perpetrators at a photo lineup conducted on February 17, 1976.

279.    Prior to February 1976, Lewis had lived and worked at the Forest Inn Motel, and therefore had personal knowledge that Sheriff Pridgen and Defendant Owens had personally collected bribes from the owner of the motel to protect the prostitution ring being conducted at the motel.  He also knew that Defendant Owens personally used the services of the prostitutes working there.

280.    In addition, Charles Lewis had engaged in criminal activity in Wilson County, including thefts and the fencing of stolen property, and had been approached by the Wilson County Sheriff's Department about participating in a robbery and splitting the proceeds.

281.    Defendant Owens therefore had a motive to protect Lewis. Lewis possessed evidence implicating Owens and Sheriff Pridgen in protecting the prostitution ring operating out of the Forest Inn Motel.

282.    Defendant Owens therefore intentionally concealed Jones's February 17, 1976, identification of Lewis from the District Attorney's office at the time of Finch's trial.

54

283.    Because Defendant Owens concealed Jones's February 17, 1976, identification of Lewis from the District Attorney at the time of Finch's trial, Finch's defense counsel did not learn of this identification prior to or during Finch's trial.

284.    Because Defendant Owens concealed Jones's February 17, 1976, identification of Lewis from the District Attorney, the District Attorney argued that Jones's failure to pick Lewis out as one of the perpetrators at the February 14th in-person lineup *bolstered* the reliability of his identification of Finch as one of the perpetrators at that line up:

> Lester Jones is a man that you ought to believe. He had nothing in the world . . . to gain by coming up here and putting his hand on that book and pointing out Charles Ray Finch. He could have as easily pointed out James Lewis or Charles Lewis in that line up and I say that tells you something about him. *He didn't point him out because he didn't believe he was one of them*, so when he saw Charles Ray Finch, he knew in his own mind that was the man who had come into that store . . . .

285.    If Finch's lawyer had been informed that Jones had picked Lewis out of a photo lineup on February 17, 1976, he could have cross-examined Defendant Owens at the trial about that fact and thereby eliminated the District Attorney's ability to argue that Jones didn't pick Lewis out of the February 14th lineup "because he didn't believe he was one of them."

286.    In fact, testimony about Jones's subsequent February 17th identification of Lewis would have tended to show that Jones's failure to pick Lewis out of the February 14th lineup *undermined* the reliability of his identification of Finch at that lineup, by showing that Jones identification of Finch was based on the fact Finch was the only person wearing a three-quarter-length black coat.

55

287.     Owens's intentional concealment of Jones's February 17, 1976, identification of Lewis as one of the perpetrators deprived Finch's lawyers of this critical exculpatory and impeachment evidence, and deprived Finch of his right to a fair trial.

<u>The Tony Horton Evidence</u>

288.     At Finch's trial, his attorney called Otis Walston to testify that on the night of the Holloman murder, he had given a ride to Tony Horton and several other black males who were in possession of a sawed-off shotgun and a second gun.

289.     Walston had provided this information to Defendant Owens.

290.     Upon information and belief, Tony Horton had a record for committing violent crimes. Ray Finch had no such record.

291.     Upon information and belief, Defendant Owens knew in early June 1976, just a few weeks before Ray Finch's trial, that warrants had been issued by the Wilson County Sheriff's Department charging Tony Horton with three country-store armed robberies in Wilson County during February and March 1976, including two country stores that Horton robbed within 5 days of the robbery at Holloman's store.

292.     Upon information and belief, Defendant Owens did not inform the District Attorney's office about the warrants.

293.     This evidence would have corroborated Otis Walston's testimony and allowed Finch's lawyer to argue that the Holloman murder had been committed by Horton, not by Finch.

294.     Defendant Owens deprived Ray Finch of his liberty without due process of law, and of his right to a fair criminal proceeding, by deliberately concealing the above-described exculpatory and impeachment evidence from the District Attorney at the time of Finch's trial.

56

295.    By intentionally concealing such evidence from the District Attorney's office at the time of Ray Finch's trial, Defendant Owens violated Ray Finch's constitutional right to a fair trial.

296.    Defendant Owens's deliberate, intentional, and reckless concealment of exculpatory and impeachment evidence directly and proximately caused Ray Finch's wrongful conviction and deprivation of liberty for 43 years, as well as the other injuries and damages set forth in this complaint.

## COUNT III

### 42 U.S.C. § 1983 CLAIM UNDER *MONELL v. DEP'T OF SOCIAL SERVS.*

(Against Wilson County)

297.    Plaintiff incorporates the allegations made in paragraphs 1 through 296 above and further alleges as follows.

298.    At all times relevant to this Complaint, the Wilson County Sheriff was the final policymaker for Wilson County with regard to all investigative activities conducted within his jurisdiction.

299.    Robin Pridgen, as the Wilson County Sheriff at all times between January 1974 and July 1976, was the final policymaker for Wilson County with regard to all investigative activities conducted within his jurisdiction during that time. Sheriff Pridgen's actions and omissions during that time constituted the policy, custom, or pattern and practice of Wilson County.

300.    As the final policymaker for Wilson County, Sheriff Pridgen created, promulgated and maintained, with deliberate indifference, policies, customs, patterns and practices which promoted, facilitated, and condoned improper, illegal, and unconstitutional conduct by WCSD

investigators, and failed to adequately train, supervise, or discipline WCSD investigators in connection with fundamental investigative tasks implicating the constitutional rights of suspects.

301.    More specifically, these policies, customs, patterns, and practices foreseeably deprived Ray Finch of his constitutional rights, including but not limited to his rights not to be arrested without probable cause, not to be deprived of his liberty without due process, and to a fair criminal proceeding by:

   a.   Encouraging, promoting, and condoning WCSD investigators to (i) fabricate evidence; (ii) engage in suggestive identification procedures; (iii) conceal exculpatory evidence; (iv) intentionally or recklessly fail to conduct an investigation to determine the true facts; and (v) foster a climate of impunity for engaging in such unconstitutional conduct.

   b.   Failing to properly train, supervise and/or discipline WCSO investigators with regard to their constitutional duties not to (i) fabricate evidence; (ii) engage in suggestive identification procedures; (iii) conceal exculpatory evidence; and (iv) intentionally or recklessly fail to conduct an investigation to determine the true facts.

   c.   In other respects to be proved through discovery and at trial.

302.    The acts and omissions that caused Ray Finch's wrongful arrest prosecution, conviction, and incarceration were carried out pursuant to the municipal defendant's policies, customs, or patterns and practices.

303.    It would have been plainly obvious to a reasonable policymaker that such policies, customs, or patterns and practices would lead to deprivations of suspects' constitutional rights.

304.    The municipal policies, customs, or patterns and practices of Wilson County proximately and directly caused Ray Finch's wrongful arrest, prosecution, conviction and incarceration.

58

305. The Wilson County Board of Commissioners knew or reasonably should have known prior to June 1976 of the corrupt practices of Sheriff Pridgen and other members of the WCSD.

306. The Sheriff of any county may, pursuant to the Constitution and laws of North Carolina, be removed from office for cause.

307. The County Attorney, who is hired and directed by the county Board of Commissioners, may upon the instructions of the county Board of Commissioners file in the Superior Court a petition to remove a county Sheriff for cause.

308. At no time between January 1974 and June 1976, or thereafter, did the Wilson County Board of Commissioners instruct the County Attorney to file a petition to remove Sheriff Pridgen for cause, based on the corrupt practices of the WCSD and Pridgen's own illegal conduct.

309. The municipal defendant thereby condoned and ratified the policies, customs, or patterns and practices of Sheriff Pridgen.

310. As a direct and foreseeable consequence of being subjected to prosecution and being incarcerated for 43 years, Ray Finch has suffered personal physical injury, physical sickness, emotional trauma, loss of consortium and loss of liberty in each year from 1976 to 2019, as well as other damages to be determined at the trial of this matter.

### COUNT IV

### 42 U.S.C. § 1983

### DEPRIVATION OF DUE PROCESS AND ACCESS TO THE COURTS IN VIOLATION OF THE 1ST AND 14TH AMENDMENTS

### (June 1979 – August 1979)

(Against Defendant McMahan in his individual capacity)

311. Plaintiff incorporates paragraphs 1 through 310 above and further alleges as follows.

312. Defendant McMahan deprived Ray Finch of his constitutional right to due process of law and meaningful access to the courts by covering up and concealing from Mr. Finch, the Wilson County District Attorney, and the courts, evidence that indicated Ray Finch's arrest and conviction were the result of the corrupt and illegal practices of Sheriff Pridgen and Chief Deputy Owens.

313. As a result of Defendant McMahan's acts and omissions, Ray Finch was deprived of evidence that would have allowed him to successfully challenge his conviction pursuant to the Motion for Appropriate Relief he filed in May 1979, which was he subject of an evidentiary hearing in the Wilson County Superior Court in January 1980.

314. No reasonable investigator in August 1979 would have concluded that he was "unable to substantiate the allegations [Finch] made . . . concerning corruption on the part of the Wilson County Sheriff's Department, especially on the part of Sheriff Robin Pridgen and Chief Deputy Tony Owens."

315. In June 1979, Ray Finch had a constitutional right to meaningful and effective access to the courts to challenge his conviction under N.C.G.S. § 15A-1415(c).

316. The acts and omissions of Defendant McMahan in July and August 1979 violated Ray Finch's constitutional right of meaningful and effective access to the courts by depriving Finch of the evidence that would have led to his 1976 conviction being vacated.

317. The acts and omissions of Defendant McMahan between June and September 1979 directly and proximately caused the wrongful incarceration of Ray Finch to continue unnecessarily from 1979 until 2019.

60

318.    As a direct and foreseeable consequence of being subjected to an additional forty years of incarceration, Ray Finch has suffered personal physical injury, physical sickness, emotional trauma, loss of consortium and loss of liberty in each year from 1979 to 2019, as well as other damages to be determined at the trial of this matter.

## COUNT V

### 42 U.S.C. § 1983

### DEPRIVATION OF DUE PROCESS AND ACCESS TO THE COURTS IN VIOLATION OF THE 1ST AND 14TH AMENDEMENTS

### (2003, 2008, 2011)

(Against Defendant Watters in his individual capacity)

319.    Plaintiff incorporates paragraphs 1 through 318 above and further alleges as follows.

320.    In the years between 2003 and 2011, Defendant Watters served as Counsel to the North Carolina State Bureau of Investigation. His job duties involved providing policy and legal advice and guidance to the Director of the NC SBI and his/her designees and employees.

321.    Between the years of 2003 and 2011, Defendant Watters deprived Ray Finch of his liberty without due process of law, and of his right of meaningful and effective access to the courts, by concealing from Mr. Finch's post-conviction lawyers exculpatory and impeachment evidence that could have been used as the basis for vacating Mr. Finch's 1976 conviction.

Defendant Watters's Conduct in 2003

322.    Upon information and belief, in late 2002 or early 2003, Professor James Coleman of the Duke Innocence Project, which was then representing Ray Finch and seeking evidence to challenge his conviction, spoke with Defendant Watters of the SBI after learning that the SBI had conducted an investigation of Mr. Finch's conviction in 1979.

61

323.     On February 13, 2003, a copy of the SBI file relating to the prosecution of Ray Finch was provided to Defendant Watters as Counsel to the SBI.

324.     The file provided to Defendant Watters contained exculpatory and impeachment evidence, including the identification of Charles Lewis by Lester Jones on February 17, 1976, and the February 1976 SBI ballistics report.

325.     Defendant Watters knew or reasonably should have known that the information in the SBI file related to Mr. Finch's case constituted exculpatory and impeachment evidence, and that concealing this evidence from Mr. Finch's post-conviction lawyers would result in Mr. Finch's further wrongful confinement.

326.     Despite this, on or about December 11, 2003, Defendant Watters informed Professor Coleman that the SBI refused to release any materials or evidence in its possession related to Mr. Finch.

Defendant Watters's Conduct in 2008

327.     In August 2008, an attorney representing Mr. Finch wrote a letter to Defendant Watters requesting a copy of any evidence relating to Mr. Finch's case in the possession of the SBI.

328.     Despite the fact that in 2003 Defendant Watters had been given the SBI file related to Mr. Finch's 1976 conviction, Watters falsely informed Mr. Finch's attorney that "a search of the files of the SBI . . . failed to uncover any such items of evidence."

329.     Defendant Watters knew or should have known that the information in the SBI file related to Mr. Finch, which had been provided to Watters in 2003, constituted exculpatory and impeachment evidence, and that concealing this evidence would result in Mr. Finch's further wrongful confinement.

62

Defendant Watters's Conduct in 2011

330.     In February 2011, pursuant to N.C. Gen. Stat. § 15A-1415(f), the Duke Innocence Project again wrote to the SBI and again requested a copy of its file related to Ray Finch's prosecution and conviction.

331.     Although this file had been provided to Defendant Watters in 2003, he did not respond to this request for seven (7) months.

332.     In September 2011, Defendant Watters finally caused the SBI to produce to the Duke Innocence Project a microfilm copy of its Finch investigative file, including a copy of Agent McMahan's report dated August 10, 1979.

333.     The materials provided, however, did not include a copy of the Wilson County Sheriff's Department files, a copy of which had been provided to Defendant McMahan in 1979.

334.     The materials provided to the Duke Innocence Project also did not include the SBI ballistics report showing that it was not possible to determine the gauge and make of the pellet allegedly removed from Holloman's body, and that it was not possible to determine whether the pellet was of the same gauge and make as the shell purportedly found by Defendant Tant in Mr. Finch's car.

335.     The ballistics report was not turned over by the SBI until *August 19, 2013*—more than *two and a half years* following the Innocence Project's statutory request to the SBI.

336.     At all times between December 2003 and August 2013, Defendant Watters knew or reasonably should have known that information possessed by the SBI related to Mr. Finch included exculpatory and impeachment evidence that would support a motion to vacate Mr. Finch's

conviction, and that concealing this evidence would result in Mr. Finch's further wrongful confinement.

337.     During the time that the Duke Innocence Project was pursuing these materials and evidence from the SBI, Mr. Finch continued to languish in prison for a crime he did not commit.

338.     Defendant Watters's concealment of files related to Mr. Finch from December 2003 through August 2013 deprived Mr. Finch of his constitutional right to meaningful and effective access to the courts, and resulted in Mr. Finch remaining incarcerated for an additional 10 years.

## PUNITIVE DAMAGES

339.     Plaintiff incorporates the allegations made in paragraphs 1 through 338 above and further alleges as follows.

340.     The acts of the individual defendants alleged above were willful, wanton, intentional, and evinced a reckless disregard for and indifference to the rights and safety of the public, including Ray Finch, who as a result spent forty-three years in prison for a crime he did not commit.

341.     The acts of the individual defendants alleged above proximately caused the injuries suffered by Ray Finch. Ray Finch is therefore entitled to recover punitive damages from the individual defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Ray Finch respectfully requests that the Court award relief as follows:

1.     Compensatory damages in an amount to be determined at trial;

2.     Punitive damages, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

3.     Pre-judgment and post-judgment interest and recovery of his costs, including

64

reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 1920; and

4.  All other and further relief to which he may be entitled.

Respectfully submitted this 4th day of December, 2019.

/s/ David S. Rudolf
David S. Rudolf
NC Bar No.: 8587
Sonya Pfeiffer
NC Bar No.: 37300
Phillip Lewis
NC Bar No.: 27944
Rudolf Widenhouse
225 East Worthington Avenue
Charlotte, NC 28203
Telephone: (704) 333-9945
dsrudolf@rudolfwidenhouse.com
spfeiffer@rudolfwidenhouse.com
plewis@rudolfwidenhouse.com

Attorneys for Plaintiff