IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:19-CV-550-BO

| | |
|---|---|
| CHARLES RAY FINCH, )<br>    Plaintiff, )<br>  )<br>v. )<br>  )<br>WILSON COUNTY; SHERIFF CALVIN L. )<br>WOODARD, JR., in his official capacity; )<br>TONY MCCOY OWENS, in his individual )<br>capacity; JAMES TANT, in his individual )<br>capacity; SPECIAL AGENT ALAN H. )<br>MCMAHAN, in his individual capacity; and )<br>JOHN H. WATTERS, in his individual )<br>capacity, )<br>    Defendants. ) | O R D E R |

This cause comes before the Court on motions to dismiss filed by defendant Wilson County and defendants McMahan and Watters. Plaintiff has responded, defendants have replied, and a hearing was held before the undersigned on October 8, 2020, at Greenville, North Carolina. In this posture, the matters are ripe for ruling. For the reasons that follow, Wilson County's motion to dismiss is granted and McMahan's and Watters' motion to dismiss is denied.

BACKGROUND

I.  Procedural history

In 1976, plaintiff, Finch, was convicted and sentenced to death in Wilson County, North Carolina for the murder of Richard Holloman. Finch's death sentence was vacated in 1977 and his sentence was commuted to life in prison. After filing several motions seeking post-conviction relief in the state courts which were denied, in 2015 Finch filed a federal habeas corpus petition which was dismissed as untimely. *Finch v. McKoy*, No. 5:15-HC-2302-BO (E.D.N.C. March 17, 2017). Finch appealed, and in 2019 the Fourth Circuit Court of Appeals held that

> Finch has overcome the exacting standard for actual innocence through sufficiently alleging and providing new evidence of a constitutional violation and through demonstrating that the totality of the evidence, both old and new, would likely fail to convince any reasonable juror of his guilt beyond a reasonable doubt. We therefore reverse the district court's decision and remand Finch's federal habeas petition back through the gateway of actual innocence so that he can receive a hearing on the merits of his case.

*Finch v. McKoy*, 914 F.3d 292, 302 (4th Cir. 2019). Following remand from the court of appeals, the State of North Carolina withdrew its opposition and this Court granted the habeas corpus petition, vacated Finch's conviction and life sentence, and ordered Finch's release. *Finch v. McKoy*, No. 5:15-HC-2302-BO (E.D.N.C. May 23, 2019). The State declined to retry Finch for Holloman's murder.

On December 4, 2019, Finch instituted this action to bring claims pursuant to 42 U.S.C. § 1983 for violations of his constitutional rights and recover damages for his forty-three years of wrongful imprisonment. The complaint alleges five claims for relief, three of which are at issue in the motions to dismiss: Count III, a claim under *Monell v. Dep't of Social Services* against Wilson County; Count IV, for deprivation of due process and access to the courts in violation of the First and Fourteenth Amendments against McMahan; and Count V, for deprivation of due process and access to the courts in violation of the First and Fourteenth Amendments against Watters.

II. Factual background

The following is a summary of the allegations in the complaint which are necessary to resolve the instant motions.

At approximately 9:00 p.m. on February 13, 1976, Richard Holloman was shot and killed inside of his store in Wilson County, North Carolina. The only eyewitness to the crime was a man named Lester Floyd Jones who was an employee of Holloman. Jones' statement describing the crime included three black males who walked up to the store after it had closed; they asked

2

to buy something and Jones and Holloman opened the store back up and let them in. One of the black males had a stocking over his head and drew a sawed-off shotgun, stated that this was a robbery, and shot Holloman. Another of the black males had on a black cap and the third was wearing a toboggan.

At the time of the robbery, defendant Owens, then Chief Deputy with the Wilson County Sheriff's Office, was in his parked car about a half a mile away from Holloman's store. In 1976, Chief Deputy Owens, Sheriff Wilbur Robin Pridgen, and other members of the Wilson County Sheriff's Department, had been engaged in rampant corruption for at least two years. An FBI investigation that began in 1977 revealed that then-Sheriff Pridgen and several deputies, including Owens and defendant Deputy Tant, had actively solicited bribes to protect prostitution rings, gambling enterprises, and the distribution of drugs in Wilson County. Wilson County deputy sheriffs further engaged in a robbery scheme, where deputies would set up robberies and burglaries to be conducted by local criminals and would divide the proceeds with the perpetrators. Country stores were often targeted as they were known to hold large amounts of cash.

Twenty minutes after Holloman's shooting, defendant Owens arrived at the scene. Owens knew Finch, as Finch had testified at the trial of two white men for the murder of Finch's brother and Finch had implicated Owens' uncle in his testimony. Although Finch, a frequent customer of Holloman's store, had not been identified by Jones as one of the three black men who committed the robbery and murder, Owens put out an APB broadcast to stop and arrest Finch.

A short time later, Finch was arrested and denied any involvement with the attempted robbery and murder of Holloman. At the time of his arrest, Finch was wearing a three-quarter

length black coat and did not have a stocking cap, black hat, or toboggan. Jones was later called to the jail to participate in a series of three line-ups, each of which would include Finch. Jones' witness statement at the scene had been altered to include the description of a man wearing a three-quarter length black coat. Owens directed the lineups and each was comprised of the same seven men who were only rearranged in their order. In each of the lineups, Finch was the only man wearing a three-quarter length black coat. Jones was also able to see Finch being brought into the Sheriff's Office from outside, which was suggestive of Finch having been arrested. Jones identified Finch as the perpetrator in each of the three lineups. During a subsequent search of Finch's car, defendant Deputy Tant claimed to have found a shotgun shell in an ashtray in the backseat.

Finch was convicted of Hollman's murder and sentenced to death. The shotgun shell and witness identification were both relied upon in Finch's trial. However, members of the Wilson County Sheriff's Department withheld exculpatory evidence from the prosecution, including an SBI ballistics report and information regarding other men who may have been implicated in Holloman's murder. The ballistics report indicated that the gauge of the pellet recovered from Holloman's body could not be determined, and thus that the SBI was unable to match the recovered pellet to the shotgun shell allegedly recovered from Finch's car.

After he was convicted, Finch and persons acting on his behalf made numerous pleas to state and local officials to review the circumstances of his conviction in light of Finch's unwavering claim of innocence, the FBI investigation of the Wilson County Sheriff's Department, and Sheriff Pridgen's subsequent indictment and conviction on federal Racketeer Influenced and Corrupted Organizations (RICO) charges in February 1979. On May 17, 1979, Finch filed a state motion for appropriate relief (MAR) alleging his innocence. Finch wrote a

letter to the then-sheriff of Wilson County alleging that Pridgen and Owens knew who had actually committed Holloman's murder and had framed Finch because the true perpetrator could have implicated Pridgen and Owens in corruption.

In July 1979, North Carolina State Bureau of Investigation (SBI) Agent McMahan was assigned to investigate Finch's claim that he had been framed. Defendant McMahan reviewed Wilson County Sheriff's Department files and interviewed Finch. Finch told McMahan that he (Finch) had told Owens upon his arrest that Charles Lewis had admitted to the Holloman murder and that Lewis had hidden his shotgun behind a building on Nash Street. At the time of the murder, Lewis was living at the Forest Inn Motel where he also worked. Lewis had told Finch that Pridgen and Owens had come out to the motel often to pick up money. Lewis had been arrested by the Wilson Police Department in connection with Hollman's murder on the night it occurred, but the charges were dismissed. Finch also gave McMahan the names of other individuals who could corroborate that Lewis had admitted to Holloman's murder, as well as the name of someone who had allegedly seen Owens give a trial witness cash in the hallway of the courthouse during Finch's trial.

McMahan interviewed Lewis, who admitted that he had lived at the Forest Inn Motel but denied ever having seen Pridgen or Owens there. During the FBI's investigation of the Wilson County Sheriff's Department which began in 1977, evidence was uncovered which revealed that one of the prostitution rings that the Sheriff's Department was protecting was located at the Forest Inn Motel, and Owens and Pridgen personally collected bribes from the owner of the motel. McMahan did not contact the FBI or any of the other witnesses that Finch had described. On August 10, 1979, McMahan concluded that he had been unable substantiate Finch's

allegations about corruption in the Wilson County Sheriff's Department, in particular on the part of Pridgen and Owens.

Without evidence to support his allegations, Finch's MAR was denied. In 2001, the Duke Innocence Project (Innocence Project) began representing Finch. The Innocence Project sought files related to Finch's case but discovered that most of the files were either missing or had been destroyed. Specifically as to the SBI files, the Innocence Project was told in 2002 that the SBI had investigated Finch's claim that he had been framed, and the Innocence Project communicated with defendant Watters, then general counsel for the SBI, about the SBI's investigation and its file. Watters agreed to consider the request.

On December 11, 2003, Watters informed the Innocence Project that the SBI would not release any material or evidence in its possession. Watters further told Professor James Coleman with the Innocence Project that the SBI would not assist him in establishing that law enforcement had engaged in misconduct. The SBI file contained, among other things, the ballistics report that had not been provided to the prosecutor who tried Finch as well as the report of Jones' identification of Charles Lewis on February 17, 1976, as one of the perpetrators of Holloman's murder.

Watters was contacted again in 2008 by private counsel for Finch who again requested the SBI's file. Watters responded, claiming that a search of the SBI's files for any evidence related to Finch's trial or uncovered during any subsequent investigation had been conducted but the search had failed to uncover any evidence, including photographs. A request was made to Watters again on February 9, 2011, by the Innocence Project. This request was made pursuant to N.C. Gen. Stat. § 15A-1415(f), which had been amended to allow access to the full records of law enforcement and prosecutor's offices involved in the investigation and prosecution of

6

criminal defendants who are investigating claims for post-conviction relief. Watters provided the Innocence Project access to a microfilm copy of the SBI's investigative file on September 13, 2011. The materials did not contain the SBI's ballistics report or any files that McMahan had reviewed from the Wilson County Sheriff's Department. The ballistics report was not turned over by the SBI to the Innocence Project until August 19, 2013.

DISCUSSION

The moving defendants have moved to dismiss the claims against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. A Rule 12(b)(6) motion tests the legal sufficiency of the complaint. *Papasan v. Allain*, 478 U.S. 265, 283 (1986). A complaint must allege enough facts to state a claim for relief that is facially plausible. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In other words, the facts alleged must allow a court, drawing on judicial experience and common sense, to infer more than the mere possibility of misconduct. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 256 (4th Cir. 2009). The court "need not accept the plaintiff's legal conclusions drawn from the facts, nor need it accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Philips v. Pitt County Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (internal alteration and citation omitted).

I.  Wilson County's motion to dismiss

Wilson County seeks to dismiss Finch's *Monell* claim against it, arguing that it is not the proper defendant. Specifically, Wilson County argues that it is well established under North Carolina law that an elected sheriff does not make policy for a county and that a county is not liable for the acts or omissions of a county sheriff or his or her deputies. The Court agrees that Wilson County is not liable for the acts or omissions of its sheriff.

7

Under *Monell v. New York City Department of Social Services*, 436 U.S. 658, 690-94 (1978), a local government can be held liable under 42 U.S.C. § 1983 for its unconstitutional policies. "A county may only be held liable for acts for which the county has final policymaking authority" and "[w]hether a county has final policy making authority in a specific area is a question of state law." *Little v. Smith*, 114 F. Supp. 2d 437, 446 (W.D.N.C. 2000) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988)).

In North Carolina, sheriffs are elected in each county by the county's qualified voters. N.C. Gen. Stat. § 162-1. Sheriffs have final policymaking authority over hiring, supervising, and discharging their deputies and other personnel employed by the sheriff's office. *Parker v. Bladen Cty.*, 583 F. Supp. 2d 736, 739 (E.D.N.C. 2008). The North Carolina Supreme Court, in 2016, recognized that

> The office of the sheriff, one of great antiquity, is established in North Carolina by our constitution. The General Assembly explicitly has recognized the unique nature of the sheriff's position. The sheriff is elected by the people, and alone is responsible for carrying out his or her official duties. In addition, the sheriff has singular authority over his or her deputies and employees and is responsible for their actions.

*Young v. Bailey*, 368 N.C. 665, 669 (2016) (internal citations omitted). In *Wilcoxson v. Buncombe County*, 129 F. Supp. 3d 308, 317 (W.D.N.C. 2014), the court determined that a North Carolina sheriff is the final law enforcement policymaker for county, *see also S. Ry. Co. v. Mecklenburg Cty.*, 231 N.C. 148, 151 (1949) (sheriff is chief law enforcement officer for the county), and then concluded that the county could be liable under *Monell* for the policy decisions of the sheriff. While this Court agrees that under North Carolina law the sheriff is the final law enforcement policymaker for the county, and not the state, it respectfully disagrees that this imputes liability to the county for the sheriff's policymaking decisions.

8

Case 5:19-cv-00550-BO   Document 58   Filed 11/05/20   Page 8 of 15

This Court's conclusion is premised on what the *Young* court recently reaffirmed – that the office of sheriff in North Carolina is a unique position, created by the North Carolina constitution, and there is a "distinct demarcation between a county government and the office of sheriff[.]" *Young*, 368 N.C. at 669. An elected sheriff is not an employee of a county, nor are his or her deputies, *see Worrell v. Bedsole*, 110 F.3d 62 (4th Cir. 1997) (unpublished), and the sheriff's office is not a program or a department of a county. *Young*, 368 N.C. at 669-70. Moreover, the Court is unpersuaded that there is a distinction that should be made between *Young*, which concerned the sheriff's internal personnel policy, and those policies which the sheriff enacts for purposes of law enforcement. At bottom, the issue here is whether the sheriff's law enforcement policies or practices which allegedly caused constitutional torts are policies over which the sheriff alone maintained authority or whether such policy decisions were made on behalf of Wilson County such that Wilson County could be held liable for them under *Monell*. The Court concludes that, under North Carolina law, the sheriff's law enforcement policies for the county in which he or she is elected are his or hers alone. Finch has failed to allege any acts over which Wilson County had final policymaking authority, and thus the single *Monell* claim against Wilson County is properly dismissed.

A fair reading of Finch's complaint, however, plainly puts the office of the Wilson County Sheriff on notice of a claim under *Monell*. *See* [DE 1 ¶¶ 299-301]. Accordingly, the Court will permit Finch an opportunity to amend his complaint to allow him to allege his *Monell* claim against the sheriff.

II.     McMahan and Watters' motion to dismiss

Defendants McMahan and Watters have moved to dismiss Finch's claims against them on three grounds: the statute of limitations bars Finch's claims, Finch has failed to state a valid

9

claim for denial of his right to access the courts, and McMahan and Watters are entitled to qualified immunity for their actions.

Finch brings claims against McMahan and Watters (the SBI defendants) for denial of access to courts. "[I]f a party engages in actions that effectively cover-up evidence and this action renders a plaintiff's state court remedy ineffective, they have violated his right of access to the courts." *Swekel v. City of River Rouge*, 119 F.3d 1259, 1262 (6th Cir. 1997). Where a party has alleged the denial of access to courts prior to filing suit, the party must demonstrate that "the defendants' actions foreclosed her from filing suit in state court or rendered ineffective any state court remedy she previously may have had." *Id.* at 1263–64; *see also Cook v. Howard*, 484 F. App'x 805, 825 (4th Cir. 2012). Additionally, the right to access to courts is "ancillary to an underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002).

A. Statute of limitations

The SBI defendants argue that Finch's access to courts claims accrued, at the latest, on August 18, 2015, when his 2013 MAR was denied in the state court. Accordingly, the SBI defendants contend that Finch's failure to bring his access to courts claims prior to August 17, 2018, three years after the MAR was denied, results in them being barred by the statute of limitations. There is no dispute that the appropriate statute of limitations for Finch's access to courts claim is three years based upon North Carolina's statute of limitations for personal injury claims. *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 388 (4th Cir. 2014); *Nat'l Adver. Co. v. City of Raleigh*, 947 F.2d 1158, 1161–62 & n.2 (4th Cir. 1991). When a section 1983 claim accrues is a question of federal law. *Wallace v. Kato*, 549 U.S. 384, 388 (2007). "For most common-law torts, a plaintiff's cause of action accrues, and the limitations

10

Case 5:19-cv-00550-BO   Document 58   Filed 11/05/20   Page 10 of 15

period commences, when the plaintiff knows or has reason to know of his injury." *Owens*, 767 F.3d at 389. However, a court must consider any distinction provided in the common law for the most analogous tort in order to determine when a plaintiff's claim under § 1983 should commence. *Id.* (quoting *Wallace*, 549 U.S. at 388).

The Court agrees with Finch that his access to courts claims against the SBI defendants were barred by *Heck v. Humphrey*, 512 U.S. 477 (1994) until the charges against Finch were dismissed on June 14, 2019. In *Heck*, the Supreme Court held that a prisoner may not file a section 1983 suit for damages if "establishing the basis for the damages claim necessarily demonstrates the invalidity of the conviction." *Id.* at 487. Finch's claims against the SBI defendants are based on his allegation that their actions extended the length of his wrongful conviction and resulting incarceration because they covered up and withheld the evidence which eventually supported the 2019 order vacating his conviction. But, under *Heck*, Finch was prevented from bringing a wrongful conviction claim until his conviction was vacated. Accordingly, the Court concludes that Finch's access to courts claims did not accrue until his conviction was vacated in 2019, and the claims were therefore timely filed.

B. Failure to state a claim

"The denial of meaningful access to the courts is established where a party engages in pre-filing actions which effectively cover up evidence and actually render any state court remedies ineffective." *Pollard v. Pollard*, 325 F. App'x 270, 272 (4th Cir. 2009). A claim for denial of access to courts requires a plaintiff to plausibly allege (1) the underlying cause of action, whether it is anticipated or lost and (2) the official acts which have frustrated the litigation. *Christopher*, 536 U.S. at 415. If the access to courts claim is backward-looking, as

11

these are, "the complaint must identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought." *Id.*

The SBI defendants argue that Finch's access to courts claim fails to state a claim because he has a valid § 1983 claim for money damages against the Wilson County Sheriff's Department defendants, and thus is not seeking any type of unique relief from the SBI defendants. Contrary to the SBI defendants' assertion, Finch has indeed alleged a unique remedy that was lost, specifically the ability to proceed in his post-conviction proceedings with the evidence that McMahan and Watters covered-up. "Plaintiff[] cannot travel back in time to seek [his] freedom in [1979, 2003, 2008, and 2011] with the allegedly withheld evidence—seeking damages now is the best substitute." *Wheatt v. City of E. Cleveland*, No. 1:17-CV-00377, 2017 WL 3174285, at *9 (N.D. Ohio July 26, 2017). Finch has sufficiently pleaded his backward-looking access to courts claim.

C. Qualified immunity

Finally, the SBI defendants contend that qualified immunity shields them from liability for their actions in this case. Specifically, McMahan and Watters argue that a backward-looking access to courts claim was not clearly established in 2013 or before, that defendant McMahan had no duty to investigate Finch's claim in 1979, and that, until 2009, Finch did not have a right to the post-conviction discovery he sought from Watters.

Qualified immunity shields government officials from liability for statutory or constitutional violations so long as they can reasonably believe that their conduct does not violate clearly established law. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). A court employs a two-step procedure for determining whether qualified immunity applies that "asks first whether a constitutional

12

violation occurred and second whether the right violated was clearly established." *Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010). A court may exercise its discretion to decide which step of the analysis to decide first based on the circumstances presented. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). When qualified immunity is raised in a motion to dismiss, the appropriate inquiry for a court is whether the plaintiff has "plead[ed] factual matter that, if taken as true, states a claim that [defendants] deprived him of his clearly established constitutional rights." *Iqbal*, 556 U.S. at 666. Accordingly, when qualified immunity is raised at this early stage, the defense faces "a formidable hurdle". *Owens*, 767 F.3d at 396 (quoting *Field Day, LLC v. Cnty. Of Suffolk*, 463 F.3d 167, 191-92 (2nd Cir 2006)).

In order to show that a right was clearly established, a party need not necessarily show that the specific act in question has been held unlawful, but he must show that "in light of pre-existing law the unlawfulness [would have been] apparent." *Wilson v. Layne*, 526 U.S. 603, 615 (1999). In 1977, the Supreme Court in *Bounds v. Smith* held that, as had been recognized thirty-five years prior, it was "established beyond a doubt that prisoners have a constitutional right of access to the courts," and further that that access must be adequate, effective and meaningful. 430 U.S. 817, 821-22. The Court determines, that at this early stage of the proceeding, Finch has sufficiently alleged that his right to meaningful, adequate, and effective access to the courts was clearly established during the relevant time periods.

McMahan next argues that he had no duty to investigate Finch's claim that he had been framed due to Owens' and other's corruption because, in the 1980s, it had been determined that law enforcement officers have no constitutional duty to keep investigating a crime once probable cause has been established. *See Kompare v. Stein*, 801 F.2d 883, 890 (7th Cir. 1986). But Finch does not allege that McMahan had a duty to continue to investigate his case once probable cause

13

had been established. Rather, Finch alleges that McMahan was assigned by the SBI to investigate Finch's claim that he was framed and that, once he was assigned to conduct that investigation, McMahan had a constitutional duty not to conceal from the district attorney exculpatory or other evidence which would have corroborated Finch's claim.

Finally, Watters' argument that Finch had no right to receive exculpatory evidence in his SBI file until 2009 when North Carolina amended its law pertaining to post-conviction discovery fails to establish that Watters is entitled to qualified immunity at this stage. Finch alleges that Watters concealed the fact that the SBI in fact did possess evidence related to Finch's trial and the subsequent SBI investigation and that he declined to turn over exculpatory evidence not because the North Carolina law prevented him from doing so, but because he intentionally concealed the evidence he knew the SBI possessed. That evidence, in particular a ballistics report and information regarding the identification of Charles Lewis as one of the perpetrators of Holloman's murder, was instrumental in vacating Finch's conviction. Indeed, the Court agrees with plaintiff that his allegation that Watters told the Innocence Project that "the SBI would not help him establish that a law enforcement officer had engaged in misconduct," [DE 1 ¶ 169], by itself, would tend to show that Watters is not entitled to any good-faith immunity.

In sum, the Court has considered the allegations in the complaint in light of the applicable standards and determines that Finch has stated timely, plausible claims for relief against the SBI defendants and that they are not, at this stage, entitled to qualified immunity.

## CONCLUSION

Accordingly, for the foregoing reasons, Wilson County's motion to dismiss [DE 39] is GRANTED and Wilson County is DISMISSED. Plaintiff is permitted fourteen (14) days to file

14

an amended complaint consistent with the foregoing should he so choose. McMahan's and Watters' motion to dismiss [DE 35] is DENIED.

SO ORDERED, this 4 day of November, 2020.

*Terrence W. Boyle*
TERRENCE W. BOYLE
CHIEF UNITED STATES DISTRICT JUDGE